[No. 26608.   Department One.   August 9, 1937.]

Marsol Credit Company, *Respondent*, v. West Coast Grocery Company, *Appellant*.[1]

*Wayne W. Keyes* and *Hayden, Metzger & Blair*, for appellant.

*Chas. Rickabaugh (Louis H. Solomon*, of counsel), for respondent.

Millard, J.—On December 13, 1933, the West Coast Grocery Company, of Tacoma, entered into a contract

[1]Reported in 70 P. (2d) 1046.

with the Duralith Corporation for the purchase of twenty-five tons of a product known as "Duralith." In connection with the purchase, the grocery company gave to the Duralith Corporation three trade acceptances, payable sixty, ninety, and one hundred twenty days after date. The first trade acceptance was paid before maturing. Payment on a check issued for the payment of the second trade acceptance was stopped, as the grocery company concluded it had been defrauded.

The trade acceptances were transferred by the Duralith Corporation to the Marsol Credit Company, a foreign corporation, and the latter company instituted an action upon the last trade acceptance, alleging that it was a *bona fide* purchaser of that trade acceptance. The defendant answered, alleging that the contract between the Duralith Corporation and itself was procured by fraud, and that the Marsol Credit Company, to which it was alleged that the trade acceptances were transferred, was not a *bona fide* purchaser.

The cause was tried to the court, which found that the contract between the Duralith Corporation and the defendant was procured by fraudulent representations on the part of the agent of the Duralith Corporation. The court further found that the "trade acceptances were purchased by the plaintiff in the regular course of its business, before maturity and for value, and without any notice of fraud in the transaction between the Duralith Corporation and defendant and without notice of any infirmity in the commercial paper purchased." From judgment in favor of the plaintiff, the defendant has appealed.

The only question presented by this appeal, in view of the finding that the contract between the Duralith Corporation and the appellant was procured by fraud,

is whether the respondent was a *bona fide* holder for value of the trade acceptance in question.

Proof by the plaintiff that he is the holder of a negotiable instrument raises a presumption that such plaintiff is a *bona fide* holder. When, however, the defendant proves fraud between the original parties to the instrument, the burden is on the plaintiff to prove that he is a *bona fide* holder.

"[Every] holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. . . ." Rem. Rev. Stat., § 3450 [P. C. § 4130].

Under the uniform negotiable instruments act, the title of a person acquiring an instrument by fraud is defective.

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtains the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud." Rem. Rev. Stat., § 3446 [P. C. § 4126].

We have consistently held that proof of fraud between the original parties imposes upon the plaintiff the onus of proving good faith. *Keene v. Behan,* 40 Wash. 505, 82 Pac. 884; *Gottstein v. Simmons,* 59 Wash. 178, 109 Pac. 596; *Citizens Savings Bank v. Houtchens,* 64 Wash. 275, 116 Pac. 866; *Spokane Security Finance Co. v. DeLano,* 168 Wash. 546, 12 P. (2d) 924.

In the opinion of the last case cited, we said:

"After the introduction of testimony by appellant [defendant] to the effect that the payee of the note obtained it by fraud, respondent corporation could no

longer rest upon the ordinary presumption that the transferee of a promissory note has acquired it in good faith, without notice of any infirmity or defect, but was required to show affirmatively its good faith."

If at the time the trade acceptance was negotiated to respondent, it had notice of any infirmity in the instrument or defect in the title of the person negotiating the instrument, the respondent is not a holder in due course.

"A holder in due course is a holder who has taken the instrument under the following conditions: . . .

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." Rem. Rev. Stat., § 3443 [P. C. § 4123].

The statutory provision as to what constitutes notice, reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Rem. Rev. Stat., § 3447 [P. C. § 4127].

After infirmity in the procurement of a negotiable instrument once appears, its possession is not enough to support a recovery thereon. In such a case, the possessor must affirmatively show his freedom from any taint of bad faith.

"In general, it may be noted that the possession of a negotiable instrument is not enough to support a recovery thereon, after infirmity in its procurement once appears, for in such case the possessor must trace title through fraudulent practices and unclean hands. Hence, his freedom from any taint of bad faith must affirmatively appear. Bad faith in a transaction of this kind is based upon a variety of circumstances, some of them slight in character and others of greater sig-

nificance. The words, 'in due course,' as used in the Negotiable Instruments Act, imply in the holder his own good faith in the acquisition of the instrument, as well as his want of notice of any infirmity which would, by reason of such notice, constitute evidence of bad faith. Everyone must conduct himself honestly in respect to antecedent parties, when he takes negotiable paper, in order to acquire title which will shield him against prior equities. While he is not obliged to make inquiries, he must not wilfully shut his eyes to the means of knowledge which he knows are at hand, for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith." 72 A. L. R. 62.

See, also, *Goodman v. Simmons*, 61 U. S. (20 How.) 343, 15 Law Ed. 934; and 3 R. C. L. 1075.

If we apply the foregoing principles to the facts, which are summarized as follows and disclose the lack of good faith in the claimed purchase of the trade acceptance, it is clear that the trial court erred in not entering a judgment dismissing the action:

The respondent credit company, which we will refer to as the credit company, was organized in 1933 at the instance and suggestion of the president of the Duralith Corporation. All of the capital stock of the credit company was owned by the Marsol Mortgage Company. The credit company was, in fact, a mere instrumentality or conduit of the Marsol Mortgage Company. Fifty-one per cent of the stock of the mortgage company was owned by the Katz family.

The Marsol Credit Company and the Marsol Mortgage Company are both Katz family corporations. The dominant factor in both corporations was Jerome F. Katz. The Marsol Credit Company was incorporated by S. F. and Jerome F. Katz. The incorporators were Lily Lotenberg, Alexander S. Levine and I. Edwin Katz. Lily Lotenberg was a stenographer employed by Jerome F. Katz. Levine was an attorney working for

Jerome F. Katz. All of their rooms connected with the Marsol Mortgage Company. Jerome F. Katz, Dr. Katz, and I. Edwin Katz are cousins. The last named Katz testified that the affairs of the Marsol Mortgage Company prior to the organization of the Marsol Credit Company were conducted by Jerome F. Katz.

The credit company came into being as the result of conversations between the president of the Duralith Corporation and Jerome F. Katz. It handled practically nothing but Duralith paper. Katz testified that the total amount of trade acceptances discounted by the credit company was approximately one hundred thousand dollars, and this was made up entirely of Duralith paper with the exception of an amount of less than five thousand dollars. He further testified that the credit company discontinued handling trade acceptances in January of 1934, when the Federal Trade Commission issued a formal complaint respecting its practices.

Before any paper was discounted by the credit company, it was first submitted to Jerome F. Katz. The so-called contract covering the discount rates was negotiated by Jerome F. Katz, who was employed by the Duralith Corporation to represent that company in the matter of complaints lodged against it with the Federal Trade Commission, on which hearing was had in Washington, D. C., in October, 1933. Jerome F. Katz was informed of the fraudulent practices of the Duralith Corporation and knew of its system of making pretended transfers of trade acceptances. His examination of the files of the Duralith Corporation also disclosed to him the fraudulent practices of the Duralith Corporation. Nine or more accounts covering trade acceptances presumably purchased by the credit company went to protest prior to the date of the claimed

purchase by the credit company of the appellant's trade acceptances.

The Marsol Mortgage Company, of which Jerome Katz was the managing officer, was the owner of the credit company. The respondent credit company was the *alter ego* of the Marsol Mortgage Company. These two corporations were organized for the purpose of handling the trade acceptances taken by the Duralith Corporation as a part of the scheme, the Duralith Corporation making the so-called transfers of the trade acceptances to third parties with a view of cutting off equities. The respondent never required, in fact it never called upon, the Duralith Corporation to make good any of the paper it claimed to have purchased from the Duralith Corporation.

Not only may it be said that respondent had knowledge of such facts that its action in taking the trade acceptances amounted to bad faith, but it had actual knowledge of the fraud of the Duralith Corporation by which the latter procured the trade acceptances. The lack of good faith of respondent in the claimed purchase of the trade acceptances is established by ample evidence.

Inasmuch as the respondent was not an innocent purchaser for value of the trade acceptance in question, the judgment is reversed, and the cause remanded with direction to dismiss the action.

ROBINSON, MAIN, BLAKE, and GERAGHTY, JJ., concur.