No. 34,157

Marsol Credit Company, *Appellant*, v. James R. Blacker and Glen D. Cole, Copartners, doing business as the Blacker Milling and Grain Company, and James R. Blacker, as Executor of the Estate of Glen D. Cole, Deceased, *Appellees*.

(95 P. 2d 285)

Opinion filed November 10, 1939.

*C. W. Trickett,* of Kansas City, and *Louis H. Solomon,* of New York City, N. Y., for the appellant.

*David F. Carson,* of Kansas City, *Charles M. Blackmar* and *Ralph M. Jones,* both of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

Smith, J.: This was an action on several promissory notes. Judgment was for defendants. Plaintiff appeals.

The petition first alleged that plaintiff was a New York corporation authorized to do business in Kansas, and that James R. Blacker and Glen D. Cole were at the time the notes were executed doing business as the Blacker Milling and Grain Company; that on December 12, 1933, defendants executed to the Duralith Corporation,

a New York corporation, their promissory note in the amount of $280.35, dated December 12, 1933, and due in two months from that date. The note recited that it was one of a series of twelve notes; and that upon default in the payment of any one of them the others would become due; that the note was endorsed on the back by the Duralith Corporation and was stamped on the face "Protested for Nonpayment this 13th day of Feb., 1934;" that this note was number 2 of a series of twelve notes executed by the defendants; that before maturity, for value, in the usual course of business the note was endorsed by the payee and delivered to plaintiff, who thereupon became and still was the owner and holder thereof in due course; that at maturity the note was presented for payment and payment was refused; that defendants had failed and neglected to pay the note. The petition then set out ten other notes in like amounts and terms except that the next note was to run for three months, and the next for four months, and so forth. It was alleged that each note became due and payable February 12, 1934. In all, eleven notes of $280.35 each were set out. Judgment was asked in a total amount of $3,083.85.

The answer of defendants was first a general denial and a denial that plaintiff was the owner. The answer then stated that they were induced by fraud and misrepresentation to enter into a contract with the Duralith Corporation for the purchase of a patented article, known as "Duralith," which was a paint used upon inside walls; that the Duralith Corporation represented to the defendants that this paint was waterproof and washable and that it would not check, all of which was known to the Duralith Corporation to be untrue at the time; that the Duralith Corporation represented to defendants that if they would enter into a contract to sell Duralith in and about Kansas City, Wyandotte county, Kansas, it would conduct a sales campaign by newspaper and radio which would insure the disposal of the first shipment of Duralith; that all of these representations were false and known to be false by the Duralith Corporation, and the corporation had no intention of performing these promises; that relying on these false representations the defendants entered into a contract with the corporation and ordered $3,000 worth of the Duralith, which was shipped to defendants, and they gave in payment trade acceptances; that this Duralith was unfit for the purpose for which it was sold and was known so to be by the corporation; that the Duralith was shipped in paper bags and

was misbranded within the meaning of the "act of congress;" that the Duralith Corporation went through the form of transferring the trade acceptances to the Marsol Credit Company; that at the time the Marsol Credit Company went through the form of receiving these trade acceptances it knew of the fraudulent acts of the Duralith Corporation and knew that the consideration of these trade acceptances had failed; that many other merchants had been induced to enter into similar contracts with the Duralith Corporation by fraud and deception; that the Marsol Credit Company lent itself to this fraudulent scheme, adopted the acts of the Duralith Corporation, and became a part thereby of a conspiracy to defraud the merchants; that the Marsol Credit Company had permitted itself to become the tool and dummy of the Duralith Corporation; that subsequent thereto the first of the trade acceptances became due, and the defendants still relying upon the fraudulent representations of the Duralith Corporation, which were at all times known to the Marsol Credit Company, entered into an arrangement with the Marsol company whereby the Marsol company would accept in lieu of the trade acceptances the notes of defendants; that while the Duralith Corporation is named as payee in the notes, the Marsol Credit Company was in truth and fact the payee therein and the Marsol Credit Company fraudulently inserted the name of the Duralith Corporation as payee in an effort to conceal its part in the fraud and to give it the appearance of being a purchaser for·value of the notes; that the Duralith Corporation never at any time had possession of the notes.

The reply was a general denial.

Subsequently Glen Cole died and the action was revived in the name of James R. Blacker and James R. Blacker, as administrator of the estate of Glen D. Cole, copartners. A supplemental petition was filed asking the same judgment against Blacker in person and Blacker as administrator. During the trial defendants were given leave by the court to add to their answer the following as to the false representations made by the Duralith Corporation: "That it would not check or crack and that it was more economical than the material ordinarily used for textile finish of inside walls."

At the trial counsel for the plaintiff made the following opening statement:

"This action is brought upon eleven promissory notes. Those notes were given to replace three trade acceptances. . . . The three trade acceptances

were due in a series of three months. The defendant desired an extension of time, and three trade acceptances were surrendered to him, and in place of them the plaintiff received twelve notes in monthly series running from month to month over a period of a year. One of those notes was paid and eleven remain unpaid, and upon those eleven suit had been instituted. The plaintiff in this case purchased this paper in the usual course of its business."

For the plaintiff, I. Edwin Katz testified by deposition that he was treasurer of plaintiff, and its business was discounting negotiable instruments; that its office was at 25 W. Forty-third St., New York City; that he conducted its business. He identified a check for $3,364.20 that was issued by Marsol Credit Company to the Duralith Corporation in pay for five trade acceptances of the Blacker Milling and Grain Company; that none of the trade acceptances were paid. He identified the eleven notes, each dated December 12, 1933, in the amount of $280.35. He identified the following letter from defendants to plaintiff:

"January 15, 1934. To Blacker Milling and Grain Company, Third street and Osage avenue, Kansas City, Kansas:

"Gentlemen: We have this day received twelve notes drawn by you to the order of the Duralith Corporation, in exchange for five trade acceptances, on which your name appeared as acceptor. The first of these notes matured January 12, 1934, and since it was not received until after this date, it will be forwarded to your bank for collection within a few days. Trusting that you will give this item your attention, very truly yours, Marsol Credit Co., Inc."

He identified the name "Duralith Corporation" on the back of the notes; and testified that he knew the officers signing were officers of the company and had authority to sign on its behalf; that at the time his company received the notes it delivered the trade acceptances to defendants; that prior to the time they received the notes the company received a copy of the letter of the Duralith Corporation that he had just identified. This witness also identified a letter from the Duralith Corporation to Marsol Credit Company, as follows:

"Gentlemen: We are enclosing copy of letter just received from Blacker Milling and Grain Company.

"In accordance with our telephone conversation, we trust that you can arrange this refinancing, billing us, of course, for the extra charges.

"We have every reason to believe that this firm will prove to be not only loyal, but also particularly successful in the territory which has been assigned to them. We are therefore most anxious to coöperate with them fully."

This witness also identified a letter of defendants to the Duralith Corporation, dated December 12, 1933, as follows:

"Gentlemen: The Marsol Finance Company hold our trade acceptances amounting to $3,364.20. Your Mr. Schill and ourselves have made the following agreement, subject to your approval.

"On delivery to the Merchants-Kansas State Bank, Kansas City, Kan., the said trade acceptances, now held by Marsol Finance Company, we will execute and deliver to said bank, to be delivered to you in lieu of said trade acceptances, which are then to be delivered to us, our series of twelve notes for $280.35 each, payable on the twelfth day of each month, beginning January, 1934, and for each month thereafter, the last maturing December, 1934, amounting in all to $3,364.20.

"This arrangement cancels any and all previous verbal or written agreements made with your company through representatives.

"You are also to 'agree that you will assist us to organize a Duralith department, for the sale of your product, and protect us in exclusive rights in our territory for 1934."

This witness also identified a telegram from plaintiff to defendants demanding payment. He testified further that the company received twelve notes and the first of them was paid; that the company did not receive any other payment from defendants; that the total of the trade acceptances purchased from the defendants was $3,364.20; that the check issued to the Duralith Corporation on the purchase of these trade acceptances was for $3,180.29; that the difference was a discount charged the Duralith Corporation by the Marsol Credit Company; that at the time the regular business of the company was the purchase and discount of commercial paper; that the Duralith Corporation was a regular customer of the credit company; that at the time the company purchased the trade acceptances it had no knowledge of any fraud, breach of warranty, breach of contract or misrepresentations made by the Duralith Company to defendants. After the introduction of the testimony of this witness the plaintiff rested. The demurrer of defendants to the evidence of plaintiff was overruled.

The defendants thereupon proceeded to introduce evidence in support of the allegations of their answer. Evidence was introduced by the plaintiff in rebuttal and by the defendant in surrebuttal.

At the close of the testimony of defendant the plaintiff filed a request that the jury be instructed to render a verdict for the plaintiff in the amount for which suit was brought. This motion was denied. Other instructions were then requested by the plaintiff and refused. After instructions of the trial court, the issues were submitted to the jury. The jury returned a general verdict in favor of the defendants. Special questions were answered as follows:

"1. Did the plaintiff purchase and pay the sum of $3,180.29 for the five trade acceptances issued by the defendant to the Duralith Corporation? A. No.

"2. At the time of said purchase did the plaintiff have any notice or information of any defects or any defenses to the validity of said trade acceptances? A. No.

"3. If question No. 2 is answered 'Yes,' state what notice or information was and the name of the party giving such notice or information. A. ——.

"4. After default in payment of the first trade acceptances, did defendant write and forward a letter under date of December 13, 1933, as follows:

" 'Blacker Milling and Grain Co., Kansas City, Kan., December 13, 1933.

" 'Duralith Corporation, 521 Fifth Avenue, New York, N. Y.

" 'Gentlemen: The Marsol Finance Company hold our trade acceptances amounting to $3,364.20. Your Mr. Schill and ourselves have made the following agreement, subject to your approval:

" ' "On delivery to the Merchants-Kansas State Bank, Kansas City, Kan., the said trade acceptances, now held by Marsol Finance Company, we will execute and deliver to said bank, to be delivered to you in lieu of said trade acceptances, which are then to be delivered to us, our series of twelve notes for $280.35 each, payable on the twelfth day of each month, beginning January, 1934, and for each month thereafter, the last maturing December, 1934, amounting in all to $3,364.20.

" ' "This arrangement cancels any and all previous verbal or written agreements made with your company through representatives.

" ' "You are also to agree that you will assist us to organize a Duralith department, for the sale of your product, and protect us in exclusive rights in our territory for 1934.

" ' "Yours very truly,

" ' "Blacker Milling and Grain Company.

" ' "By: James R. Blacker." ' A. Yes.

"5. Did defendants, under date of December 21, 1933, write a letter to the plaintiff in which they stated as follows:

" 'We are to make twelve notes, handling the amount of the trade acceptances, which is $3,364.20. You are to send your trade acceptances to the Merchants-Kansas State Bank, Kansas City, Kan., with instructions to deliver them to us upon our surrender of these twelve notes, which are due one each month for the next twelve months. The Merchants State Bank will then deliver your notes to you. Handling the matter in this way will get the entire situation straightened out without any confusion.' A. Yes.

"6. Were the twelve notes executed and delivered to plaintiff and the trade acceptances surrendered to defendant? A. Yes.

"7. Did defendant pay the first of said twelve notes? A. Yes.

"8. Are the twelve notes sued on in this action the remaining eleven notes shown delivered by the defendant for the surrender of the trade acceptances? A. Yes.

"9. Did defendants at any time, either orally or in writing, make any statement or intimation to the plaintiff, the Marsol Credit Company, that there was any defect or defense to the validity of these notes prior to the filing of their answer in this case? A. No.

"10. If question No. 9 is answered 'Yes,' state in substance what it was and when and by whom given. A.

"11. After the notes in suit were delivered by defendant, did defendants offer to return the merchandise to Duralith Corporation for the plaintiff at any

time before suit, except a claimed offer to return made to Schill, a salesman for Duralith Corporation, in a conversation in February, 1934? A. No.

"12. Did Duralith Corporation notify the defendant before February, 1934, that its representatives had no authority to bind Duralith Corporation without previously obtaining the consent of the company? A. Yes.

"13. After February, 1934, did defendant continue to sell the merchandise purchased from Duralith Corporation and did defendant make sale thereof as late as August, 1935? A. Yes.

"14. Did the Duralith Corporation make representations to the defendant through its agent, that:

"(a) Said paint was waterproof and washable? .

"(b) That it would not check or crack?

"(c) That it was more economical than the material ordinarily used for texture finishes for inside walls? A. (a) Yes. (b) Yes. (c) Yes.

"15. Were any or all of these statements false? Answer fully: (a) False. Unless varnished. (b) False. It did crack according to evidence. (c) False. According to evidence it was proven.

"16. Is plaintiff the owner of the notes sued on? A. No.

"17. Did Jerome Katz pass upon the notes purchased by the plaintiff and sued on herein? A. Yes.

"18. Is the plaintiff an innocent purchaser for value of the notes sued on without notice? A. No.

"19. Did any money pass between the plaintiff and the Duralith Corporation for the notes sued on? A. No."

The plaintiff filed a motion to set aside the answers to certain of the above questions and the general verdict because they were contrary to the undisputed evidence. This motion was overruled. After the motion of the plaintiff for a new trial was overruled judgment was rendered for the defendants. Hence this appeal.

Plaintiff first argues in this court that the trial court erred in overruling the demurrer to the evidence of defendants and in denying its motion for a directed verdict. This argument is based on the testimony heretofore pointed out that plaintiff bought the trade acceptances and paid $3,180.29 for them; that this money was used for the Duralith Corporation and none of it returned to plaintiff. The answer of defendant was that the plaintiff did not purchase or own the trade acceptances, was a mere tool of the payee and was engaged in a conspiracy to defraud the defendant by attempting to appear as a purchaser for value and without notice. If there was evidence submitted by the defendants sufficient to warrant the submission of this question to the jury, then the court ruled correctly on the demurrer to the evidence and the request for an instructed verdict. This requires an examination of the evidence of defendants.

The plaintiff put on the stand the president of the Duralith Corporation. This witness testified that the trade acceptances were bought by plaintiff on November 10, 1933. A letter had been introduced in evidence under date of November 17, 1935, from the Duralith Corporation to defendants. That letter was as follows:

"GENTLEMEN: According to present indications there may be a possibility that we may have to rediscount in the market some of the acceptances in our portfolio. Among these, of course, will be the paper which we have recently accepted from you in settlement of our invoices. It occurred to us to take the liberty of writing you and offering the trade acceptances to you at a discount. Commercial banking rates have 'stiffened' recently and we can afford to allow an extra 1% above the cash discount. The saving to you, if you take advantage of our offer on this transaction, would be $134.57. The above figure on the basis of 4% is a saving of a great deal more money than the 6% per annum that your local banker would charge. This, of course, must not be considered a precedent, as rates may not always be so unfavorable. If this is of interest, kindly mail your check promptly and we will be pleased to return the acceptances.

"Very truly yours,     DURALITH CORPORATION,
"HAROLD P. ORENS,
HPO:DH                               *"Credit Manager."*

It will be noted that this letter was written seven days after plaintiff claimed to have bought the trade acceptances. The letter speaks of trade acceptances in the portfolio of the Duralith Corporation and offers the defendants a discount for payment. The fact that the payee was referring to the trade acceptances as being in its portfolio seven days after the plaintiff claimed to have bought them required some explanation. The president of the Duralith Corporation testified as follows:

"Q. Now, I notice that you testified that the trade acceptances were discounted on the 10th. And I refer you to a letter dated November the 17th, a letter addressed to the Blacker Milling and Grain Company. Now, will you state what the circumstances were that were followed by the letter. A. Mr. I. Edwin Katz had 'phoned me that our line with him had been passed, and he urged me to reduce it."

He testified further:

"They always had the privilege of asking us to take out any paper that for some reason they would want out. We had the privilege of taking out from them which for our purposes we might want out."

The jury was entitled to consider this circumstance as some evidence that plaintiff had not bought the trade acceptances at all or that the transaction was not in good faith. On the question of a demurrer to the evidence or for an instructed verdict, the defendant

was entitled to have every inference drawn that was favorable to its defense. In *Security Co. v. Low*, 112 Kan. 153, 210 Pac. 190, in dealing with a similar question, this court said:

"That evidence being adduced, the burden then shifted to the plaintiff to show that it had received the notes in due course and without notice of any infirmity therein. Plaintiff attempted to shoulder that burden, and the president of the plaintiff corporation, a Chicago concern, testified that he had purchased the notes from the payee, a Tennessee concern, some eight days after the notes were dated and signed; and that he had no notice of any infirmity in them. But it was significantly shown that certain correspondence touching these notes had passed between the plaintiff and the payee after this alleged purchase, and while most of this correspondence was conveniently absent from the plaintiff's files and not forthcoming at the trial, yet enough of it was produced to show that the plaintiff was taking instructions from the original payee, and that plaintiff's course of conduct was directed by that party, and that the latter withheld action to recover on these notes until the original payee had exhausted its efforts to induce the defendant to go ahead with the original contract or to enter into a new one. These facts and circumstances tended to prove that the plaintiff did not own the notes as a bona fide holder, and that the action in its name was merely an attempt to cut off such defenses as might be made if brought by the original payee. Mayhap this evidence was not strong, but it certainly went far enough to put the question beyond the power of the trial court to decide in favor of plaintiff as a matter of law, and to make it a jury question; and in response to a special question the jury answered: 'Did plaintiff purchase the notes sued upon prior to their maturity? Answer: No, not purchased at all.'" (p. 154.)

Here the claim of plaintiff is based on the fact that it claimed to have bought the trade acceptances on November 10 and 11, 1933, before their maturity. The answer of the jury that it did not buy them at all was sustained by the evidence to which reference has just been made.

*Ireland v. Shore*, 91 Kan. 326, 137 Pac. 926, was an action on notes by one who claimed to be a holder in due course. The answer was that the notes were procured through fraud and that plaintiff was not an innocent purchaser. The jury found, in answer to a special question, that the plaintiff did not purchase the notes. In discussing the question we have here the court said:

"Frank N. Ireland testified by deposition that he had an agreement in the form of a letter outlining the way in which the plaintiffs were to handle the paper of Robert Burgess & Son. When the deposition was taken this agreement was in the Washburn bank, an institution run by Charles H. Ireland and others, and only a block away from the office where the deposition was taken. When asked to produce the agreement the witness refused to do so on the advice of counsel. The legitimate inference was that if produced it would be

detrimental to the plaintiffs' case and of benefit to the defendant. . . . The conclusion drawn by the jury from all the facts and circumstances, that the plaintiffs were not owners, but were merely assisting Robert Burgess & Son to realize on the paper, was not unreasonable." (pp. 332, 333.)

See, also, *Bank v. Sams*, 96 Kan. 437, 152 Pac. 28.

In addition there is evidence of a statement of an agent of the Duralith Corporation. Blacker testified that a man named Schill, who represented himself as the finance man for the Duralith Corporation, came and said he wanted to talk about getting the trade acceptances paid. He further testified:

"And I said I had received a letter from the Duralith Corporation stating that they had disposed of the trade acceptances to the Marsol Credit Company, and I jumped him about the matter then, and told him about our agreement with Mr. Henkin that they would not dispose of them but simply hold them in their care, and he said that didn't make any particular difference, that the Duralith Corporation had organized this Marsol Credit Company to handle their financial affairs, and it was all in the same company, and that he could operate for either one. That he would handle this for the Duralith Company. Those notes were made out at the time Mr. Schill was here.

"He wanted to take them away, and send us the other, and we wouldn't let him. We told him if he would send these trade acceptances back through the bank, that we would deliver the notes to the bank and they would give us the trade acceptances.

"Q. Are these notes about which you are talking now, these notes that the plaintiff is introducing in evidence, marked from 1 to 12, the twelve notes—or twelve notes, at least? A. Yes, sir.

"Q. Is that what you are referring to? A. Yes, sir."

This is a circumstance that the jury was entitled to take into consideration. It is true that the record discloses a letter from the Duralith Corporation to defendants stating that it did not give any authority to any representative to bind it without first obtaining the company's consent. However, the defendants were entitled to have every inference favorable to them drawn from this circumstance. Moreover, the president of the Duralith Corporation admitted that Schill was its employee and had the right to pick up trade acceptances. We have concluded that the trial court did not err in overruling the demurrer to the evidence of defendants and in denying the request for a directed verdict for plaintiff. (See, also, *Marsol Credit Co. v. West Coast Gro. Co.*, 191 Wash. 134, 70 P. 2d 1046.)

Defendant points out the answer to special question No. 2 as follows:

"Q. At the time of said purchase did the plaintiff have any notice or in-

formation of any defects or any defenses to the validity of said trade acceptances? A. No."

The purchase referred to, no doubt, is that spoken of in the preceding question where the jury found that the plaintiff did not purchase the trade acceptances issued by defendant and pay $3,180.90 for them. When the two questions are examined together and in connection with the other questions and answers no inconsistency appears.

Plaintiff next argues that the trial court erred in not giving an instruction requested by it to the effect that the exchange of notes for the acceptance barred any defense that might have been interposed to the old trade acceptances because it secured an extension of time upon the statement that it would cancel all agreements and understanding, verbal and in writing. The trouble about this argument is that if plaintiff did not purchase and own the trade acceptances any concessions it might make could not give it any greater rights in the notes exchanged for the acceptances. The statement made by defendant regarding cancellation of all agreements could not confer any ownership on defendant. The statement was made to the Duralith Corporation, not plaintiff, and was made before the fraud in the representations as to the quality and merits of the material was discovered. We hold that the notes had the same status as the trade acceptances and any defenses available against the acceptances remained available against the notes. On a like question this court said:

"The appellant had already paid his money to the Kemper Grain Company when he took the new note. He parted with nothing, nor did the appellee receive anything in consideration for it. It was a mere substitution of one promise for another, both resting upon the same illegal consideration, of which the appellant had actual notice as well as notice afforded by the form of the original instrument. (*Graham v. Wilson,* 6 Kan. 489.) The renewal is not free from the infirmity of the original instrument. The poison of illegality remains in the new note, for it is a continuation of the former." (*Hutchins v. Stanley,* 88 Kan. 739, 748, 129 Pac. 1180.)

To the same effect see *Wegner Bros. v. Biering & Co.,* 65 Tex. 506.

The plaintiff next argues that the trial court erred in refusing to instruct the jury as requested by plaintiff. No argument is made on this point except to state plaintiff believes that this court will find on reading the requested instructions that every one of them was in accordance with the law. We have examined these requested in-

structions and hold that such of them as should have been given were covered by the instructions actually given.

Plaintiff's next assignment of error is that the trial court erred in the instructions as a whole. No argument is made on this point. Assignment of error No. 6 is that the trial court erred in its instruction as to rescission of the contract when rescission was not in the pleadings and no evidence was offered concerning it. The plaintiff cannot complain because the trial court gave an instruction on rescission, since it requested such an instruction. There was no occasion for the defendant to plead rescission. The defenses were the plaintiff was not the owner of the notes, not an innocent purchaser for value; that the notes were obtained by fraud; that the consideration failed and that plaintiff lent itself to a conspiracy to defraud defendant. The defendant proved to the satisfaction of the jury that plaintiff was not the owner of the notes and was not a holder in due course, hence defendant was relieved from liability. Furthermore, rescission was proven by the testimony of Blacker that he told Schill, the agent of Duralith, that he would load the material on the cars and ship it back to the Duralith Corporation. Plaintiff argues that the court should have instructed the jury that even if defendant did tender back the merchandise, but thereafter continued to sell any of the material, it thereby waived the rescission. The paint sales made after the offer to return the material amounted to $67.04. Defendant had paid plaintiff $280.35 on the first note. This was from money received from a sale which defendant later had to refund. The sale of the $67.04 worth of material was merely an attempt to recoup part of this loss.

Plaintiff next argues that the trial court erred in refusing to set aside the answers to certain special questions because they were contrary to the undisputed evidence. This argument has received our attention, in a measure, in our consideration of the demurrer to the evidence and the motion for a directed verdict. We have examined the record and hold that the answers were all sustained by the evidence.

The judgment of the trial court is affirmed.