No. 35,191

THE STATE OF KANSAS, *Appellee*, v. C. D. LAMMON, *Defendant;*
LAWRENCE BRYAN, *Appellant*.

(113 P. 2d 1052)

Opinion filed June 7, 1941.

*F. C. Norton, H. L. Smither* and *John Hamilton Wilson,* all of Salina, for the appellant.

*Jay S. Parker,* attorney general, *F. J. Brettle* and *C. L. Clark,* both of Salina, for the appellee.

The opinion of the court was delivered by

ALLEN, J.: This is an appeal from a conviction of kidnaping in the second degree. The defendant presents four assignments of error, as follows:

"1. The court erred in the court's motion to dismiss for the reason that the state failed to show the crime charged in the information had been committed.

"2. The court erred in refusing material and necessary instructions requested by the defendant.

"3. The court erred in instructions given to the jury.

"4. The court erred in approving the verdict and in overruling the motion for a new trial."

Prior to a discussion of the alleged assignments of error, a brief statement of the facts will be necessary.

Bennie Saum, the complaining witness, testified that he lived in Salina; that he went to the Dreamland roadhouse on the evening of Sunday, November 3, 1940, after cigarettes, and remained there until about 1 o'clock. About 12 o'clock he met the defendant Bryan and talked with him; that defendant said he was a traveling salesman out of Kansas City and wanted to know where he could get some Scotch. Saum told him he didn't know where unless it would be at a hotel. The testimony discloses that Saum and Bryan drank

one or two spiked cokes and that Saum said he would have to be home around 1 o'clock and defendant said he would "take me by when he went to town."

Just as they were leaving, a big fellow·whose name Saum did not know, got into the car with them and sat at Saum's right in the front seat.

Saum testified that his house was about half a mile north of Dreamland on the highway; that Dreamland is west from the eighty-one by-pass; that when they drove away from Dreamland the car headed east, and when they got to the by-pass, Bryan turned south, and in answer to Saum's statement that he lived north, told him he would turn around at the corner and take him back. Bryan then turned west on Crawford to where a car was parked, and the large fellow drew a pistol on Saum and asked him where the whisky was that he had stolen. Saum replied he didn't know anything about it. About this time a Bill Lammon got out of the parked car, which immediately drove away, and got into defendant's car, stating that he had lost about a thousand dollars worth. of whisky which was stolen from some farmhouse; that Saum had something to do with it—that he had stolen it—and wanted to know where it was. Saum told him that he knew nothing about it and didn't even know he had lost any. From there they drove to the Serrault farmhouse and stopped, and the big fellow told Saum if he should run he would· shoot him. Bill Lammon inquired of Mrs. Serrault if Saum "was one of them that had been out there," and she replied, "No, it wasn't him." Mrs. Serrault testified that Lammon then slapped at Saum and he staggered.

Saum testified that they all left the house and drove towards Salina, but stopped after they had driven about a mile; that the big man choked him right hard and Bryan said "I will make him talk," and the big man held him while the defendant burned him about twenty-three times on the chest and neck with the electric cigar lighter, heating it six or seven times; that Bill Lammon then said they would take him to his house and tie him up, that they weren't through with him yet. Saum testified:

"We went through the front door and into the basement. They told me to lie down on the bed. They was going to tie me up. Bud tied me. He had my hands down behind me and they were crossed and they had my feet tied up to my hands. They left, and they left me there alone. It seemed like around three hours. While I was there some woman came down there. I have seen her here since. I saw her in the city court in the hearing over

there. She was talking to Bill Lammon. The next person after the woman I saw was Bud and Lammon and this big fellow. They untied me and we went upstairs, up in the living room. And the woman was there and they begun asking me if I knew anything about this whisky and I told them no and they wanted to know where some of the plants that any of my brothers might have had and I told them of some plants that they had. I told them there was one over by Minneapolis. Bryan took two drinks and I took one."

Saum further testified that he must have been tied in the basement between 2 and 2:30 o'clock, and that they must have left for Minneapolis about 6 o'clock; that when they returned to Salina they went back to Lammon's house; that they later left the house to go over to Saum's brother's, but that they first went to Saum's house, where he showed his wife what had happened and told her not to call the police until he got away; that Lammon told Mrs. Saum some of his whisky, about $1,000 worth, had been stolen and that he thought it was her husband who had stolen it; that Bryan then told Mrs. Saum that she was lucky to have a husband "because we intended to kill him"; °that they later went to the home of Saum's brother but he was not at home. Saum testified that after going to Art's cafe and to Corum Brothers' garage he was taken home—about 12 o'clock noon; that he had burns on his hands, and the print of the rope was on his hands and arms; and "I did what they told me to do because they had the gun on me and I thought it was best."

On recross examination Saum testified:

"Q. Now you say you didn't tell your wife to call the police. What was the reason for that now? A. Because I was afraid they would kill me.

"Q. Oh, you were afread they would kill you? A. Yes.

"Q. What did they do to make you believe that, when they left your place and went over to Arnolds? A. They told me that, when they started with me.

"Q. When did they tell you that? A. Well, they told me that at Serraults."

Defendant's story of the events of November 3 differs in many particulars from that told by Saum. However, the jury chose to believe in the main the story as told by the complaining witness which, it may be noted, is not uncorroborated.

Appellant complains that the court erred in the giving of instructions 10, 11, 12, 13, 18 and 19.

This court will not ordinarily review alleged errors in the giving of instructions where the instructions given are not contained in the record. (*Rierson v. Southern Kansas Stage Lines Co.*, 146 Kan. 30, 69 P. 2d 1; *Brugh v. Albers*, 141 Kan. 223, 40 P. 2d 380; *Wilson v.*

*Doolittle,* 114 Kan. 582, 220 Pac. 508.) We will, however, briefly discuss the instructions complained of.

Instruction No. 10 defines the words, "wilfully," "unlawfully," "feloniously" and "inflict" as used in instructions 18 and 19. While perhaps the use of the word "feloniously" was not necessary under the wording of the statute, we fail to see how defendant was prejudiced by its use.

Instruction No. 11 reads:

"Upon the question of intent you are instructed that a man is presumed to intend to do that which he in fact does do, and he is presumed to intend the natural and probable consequences of his own voluntary act or acts."

Appellant suggests that "instruction No. 11 amounts to instructing the jury that if the secret assailant successfully enforces his unlawful but secret domination then that fact supplies the *intent* to accomplish the victim's *secret* confinement."

We think the instruction fairly states the law. (*State v. Dull,* 67 Kan. 793, 74 Pac. 235; 20 Am. Jur. 227, §§ 232, 233; 10 R. C. L. 874.)

It is suggested that instructions 12 and 13 are in effect an instruction that any secret compulsion exercised upon a person, though he may walk abroad in public and apparent freedom amounts to a "secret confinement." Instruction 12 defines "kidnap" as follows:

"The word 'kidnap' as used in the information and these instructions means not only actual, corporal and forcible taking and carrying away and detention of a person against his will, but also means coercion by threats, and menaces of fear induced by threats and menaces amounting to coercion of the will of such person *resulting in the taking and carrying away and secret detention and confinement of such person against his will.*" (Italics ours.)

As we read the instruction, it properly informs the jury that the taking and carrying away and secret confinement may be accomplished without physical violence to the body, as shown by the italicised portion above. Instruction No. 13 defines the word "confine." No attempt is here made to define the phrase "secret confinement." The court need not define every phrase used by it. (*State v. Inverarity,* 150 Kan. 160, 92 P. 2d 45.)

Instruction No. 19, we think, fairly states the law under the evidence. When all the instructions abstracted are considered together we have no difficulty in holding that the instructions as a whole were not erroneous.

Appellant next complains that the court refused to give certain requested instructions. Here again we are confronted with the diffi-

culty of considering the alleged error when all of the instructions given are not before us. (*Rierson v. Southern Kansas Stage Lines Co.*, supra.)

In any event the pertinent portion of requested instruction No. 7 is, we think, covered by instructions No. 13 and 19, given by the court. (*Marsol Credit Co. v. Blacker*, 150 Kan. 477, 95 P. 2d 285.)

Under this heading appellant states: "Also, the jury should have been instructed on the lesser crimes the evidence tended to prove. The crime of assault and the crime of assault and battery should have been instructed on."

This is not a prosecution under G. S. 1935, 21-436. The prosecution is one for kidnaping as defined in chapter 156 of the Laws of 1935 (G. S. 1935, 21-449 to 21-452). As enacted, the title of the act reads: "An act relating to crimes and punishments defining the offenses of kidnaping and relating to the trial of the same and punishment therefor . . ." Instructions under sections 21-449 and 21-450 were pertinent under the evidence. These sections denounce the crime of kidnaping. Simple assault is not a degree of the crime of kidnaping. (*State v. Kelley*, 125 Kan. 805, 265 Pac. 1109.)

The fourth specification of error is on alleged misconduct of the jury. The evidence on the motion for a new trial disclosed that one of the jurors played a joke on the foreman of the jury. There was testimony to the effect that the episode in question occurred after all the jury had voted to convict the defendant. The defendant was charged with kidnaping in the first degree under section 21-449 and in the second degree under section 21-450. After the joke episode not only was the verdict of guilty allowed to stand, but the defendant was found guilty of kidnaping in the second degree. It is therefore obvious that the perpetration of the joke could not have been prejudicial to the defendant.

The evidence on the motion for a new trial does not disclose that any juror acquired independent information of an evidentiary character during the episode.

The question of the misconduct of a juror in the first instance is for the trial court. In overruling the motion for a new trial the court determined the irregularity charged was not prejudicial to the defendant. The court had the opportunity to observe the demeanor of the witnesses, was aware of all the circumstances and the conclusion reached should not lightly be set aside. As stated in *State v. Stuart*, 129 Kan. 588, 283 Pac. 630, "Of course not every act of

misconduct is ground for granting a new trial. If it be trivial, or not such as to influence the jury, the misconduct will not vitiate a verdict." (p. 590.)

As the evidence does not disclose that the practical joke perpetrated on the foreman affected the jury in arriving at their verdict or was prejudicial to the defendant, the motion for a new trial was properly overruled.

Finding no error in the record the judgment must be affirmed. It is so ordered.