No. 40,300

STATE OF KANSAS, *Appellee*, v. JOSEPH ZEBEDEE BROWN, *Appellant*.

(312 P. 2d 832)

Opinion filed June 8, 1957.

*William H. Towers* and *Myles C. Stevens*, both of Kansas City, and *Elisha Scott*, of Topeka, argued the cause; *Harry Hayward*, of Kansas City, was with them on the briefs for appellant.

*Newell A. George*, Assistant County Attorney, and *James P. Davis*, Assistant County Attorney, argued the cause; *John Anderson, Jr.*, Attorney General, *Paul Wilson*, Assistant Attorney General, *Donald E. Martin*, County Attorney, and *Robert J. Foster*, Assistant County Attorney, were with them on the briefs for appellee.

The opinion of the court was delivered by

Schroeder, J.: This is a criminal action in which the defendant, Joseph Zebedee Brown, appellant herein, was tried and convicted on three separate counts: kidnaping in the first degree, forcible rape, and assault with intent to rape. From the verdict and judg-

ment entered against him, the defendant appeals to this court, specifying as error certain rulings of the court.

Trial began on the 30th day of January, 1956, and concluded with a verdict on the 9th day of February, 1956.

Mrs. Harris, one of the complaining witnesses in this criminal action, lived at 3617 Freeman Avenue, Kansas City, Kansas. She was a white woman and at the time of the trial was fifty-seven years old. After she got off from her work on February 21, 1955, at about 9:00 o'clock p. m., she went to her car which was in a parking lot at Eighth and Nebraska, Kansas City, Kansas. When she sat down in her car, some man stepped up from behind, opened the door, slid into the driver's seat and forced Mrs. Harris over to the other side of the car with a gun. She asked the man, "What are you going to do?" The man said, "Be quiet and you won't get hurt." Mrs. Harris worked at the Bodker's Clothing Store. She stated that the man, later identified as the defendant—a nineteen-year-old colored youth, drove her automobile out of the parking lot without her consent. He drove up and down streets and finally drove down an alley and behind a building in which the Nebraska Waste Paper Company was located.

According to the testimony of Mrs. Harris, the defendant said, "I don't want your money, I don't want your car." She then asked the defendant, "What do you want?" and he said "I am going to rape you."

After the defendant turned in behind the said building, he stopped the car and told Mrs. Harris to take off her clothing. This she refused to do. Then, the defendant forced her to the opposite side of the car and hit her on the shoulder with a gun. Mrs. Harris testified that the defendant took off her undergarments and forced her at the point of a gun to have sexual relationship with him.

After this incident, Mrs. Harris was released by the defendant at a stop light, where he jumped out of the car and ran off into the darkness. She went to a tavern and called the police. A detective named Don. Adams, answered the call and took Mrs. Harris to her son's home.

Later Mrs. Harris went to police headquarters and identified defendant in a line-up of five men. Mrs. Harris testified at the trial that the defendant was the man that she identified at police headquarters, and she pointed him out in the courtroom as the man who raped her.

On the night of February 28, 1955, exactly one week after the foregoing incident, Mrs. Ruth Brakey was assaulted. Mrs. Brakey lived in North Kansas City, Missouri, at 2815 East 56th Street and worked at Maslan's Department Store in Kansas City, Kansas. At approximately 9:00 o'clock p. m., on the 28th day of February, she went to the alley after work to get into her parked car. As she got in from the right side a man who wore a mask and had a revolver in his hand tried to get into her car from the left side. Mrs. Brakey kicked so furiously that she kicked the mask off the man and got a good look at him. In the process she screamed and attracted the attention of persons nearby. The defendant escaped into the darkness and later Mrs. Brakey picked the defendant out at police headquarters and identified him as the man who attempted to get into her car.

Don Adams, a detective working out of the police department of Kansas City, Kansas, met Mrs. Harris on the night of February 21, 1955, at a tavern located at 11th and Quindaro in Kansas City, Kansas, pursuant to a call he had received from headquarters. He related that Mrs. Harris was nervous, excited, crying and emotionally upset at the time.

Subsequently, on the 28th day of February, 1955, Mr. Adams saw the defendant, Joseph Zebedee Brown, at the detective bureau headquarters where he had conversation with him. At that time the defendant made a statement in writing as follows:

"My name is Joseph Zebedee Brown, and I reside at 823 Ohio Street in Kansas City, Kansas. I was told by Detective Don Adams that I had the right of an attorney, and that I did not have to make a statement unless I desire to do so. My Constitutional rights were explained to me by Detective Adams. Knowing this, I wish to tell what I know about the rape of a white woman that occurred the Monday night of February 21, 1955. This happened about 9 p. m. at night.

"I work for the Nebraska Paper Company, and on that date I got off from work about 5 p. m. I went home about 8 p. m. and walked down to Fifth and Chelsea and came up to Seventh Street, and walked up to Eighth and Everett. When I arrived at Eighth and Nebraska, I saw a white woman crossing the street and get into her Plymouth. I saw her open the door of her car and get in. I walked over to her car and opened the door to her car, and had my .38 caliber gun in my hand. I told her to scoot over, and I got into the car under the wheel. I drove straight down Eighth Street to Chelsea, and finally went to in back of the Nebraska Waste Paper Company, where I raped this white woman. I told her I did not want her money when she offered it to me. After I completed this act, I drove to about Hallock and Chelsea, where I got out of the car.

"For the past three or four years I have noticed a woman who works at Maslan's store. She parks her car in back of the store. I decided on Sunday, February 27, that I would like to have intercourse with her. On this date, February 28, 1955, I left home about 8:10 p. m. and went to Seventh and Ohio, where I bought a half pint of gin. I went to my grandmother's to in back of Maslan's store, where I spotted this woman's car. The car was a 1949 Chevrolet, 2-door. I broke out the front door glass on the driver's side of the car. In about five minutes this white woman came down to her car and got into her car. I do not know whether she saw the glass was broken out or not. I was standing in the dark, close to her car, and as soon as she got into the car I immediately walked over to the car. This woman saw me and started kicking at the door of the car, and screaming. I saw that there was several people looking my way and I ran to Fifth and State, where I saw a car parked. I asked the man in the car to take me to Eighth and Everett, where I got out of the car. I walked to the parking lot between Nebraska and Washington on Eighth Street, where I got into a car that was parked. I sat in this car for five or ten minutes. I got out of this car and walked to Eighth and Nebraska, where the officer arrested me.

"I have made this statement of my own free will and accord, and I was not threatened or promised in any way in order to make this statement. I have read this statement, consisting of two typewritten pages, and swear that this statement is the truth, to the best of my knowledge."

The foregoing confession was signed "Joseph Zebedee Brown" and the witnesses indicated were William Pickering, K. Van Horn and Don Adams.

The foregoing confession was introduced in evidence by and through Don Adams, the detective, without any objection on the part of counsel for the defense, except for the fact that Don Adams in reading the statement indicated where a correction, was made and counsel for the defense then addressed the court:

"I move to strike out any observation of this witness in reference to the statement. This statement is the best evidence."

Thereupon the court struck the observation.

The further detailing of facts necessary for the disposition of this appeal will be set forth as the assignments of error are presented.

The defendant's appeal was properly perfected and all rights protected on those matters which the defendant specifies as error. Principally, the specifications of error may be grouped into three points. The defendant sets them forth in his brief as follows:

"I.

"Was it prejudicial error on the part of the trial court to overrule defendant's motion to require the State to elect as to which count the State intended to rely on for conviction?

"II.

"Can the testimony of a witness given in a preliminary hearing be read in evidence by the State against a defendant in a criminal action, over his objection, without a satisfactory showing that due diligence had been used by the State in an effort to secure the presence of said witness?

"III.

"Where a first degree kidnapping statute, such as Section 21-449, G. S. 1949, specifically provides that the kidnapping must be for a particular intent and purpose, namely holding for ransom or reward, that being the only offense enumerated therein, should said statute by construction of the Court be extended to cover other offenses not enumerated and by interpolation read into the statute the crime of rape?"

Focusing our attention now upon the first proposition presented, the defendant contends that the trial court erred in overruling the defendant's motion to require the state to elect upon which of the two separate offenses charged in the amended information the state would rely for a conviction of the defendant, that the trial court erred in overruling defendant's motion to quash for the same reason, and the trial court erred in overruling the defendant's motion requiring the state to elect at the close of all the testimony. The defendant's precise contention is that it was illegal to join the counts which charged the defendant with kidnaping in the first degree and the rape of Eva Harris, with the offense of assault with intent to rape. It is argued that these are unrelated offenses not arising out of the same transaction, that the motive was not identical and that the different offenses were not part of one comprehensive plan, purpose and design on the part of the defendant.

In support of this contention the defendant cites *State v. Thompson*, 139 Kan. 59, 29 P. 2d 1101. This case involved the joinder of felonies in different counts of the same information in which the first count charged rape of a woman and the second count charged robbery of a man of an automobile. The court held this joinder to be proper on the ground that these offenses grew out of the same transaction and the fact that the car belonged to the companion of the girl raped did not affect the essential unity and identity of the hideous action which was all part of one comprehensive plan. The language seized upon by the defendant in the *Thompson* case was a dictum by Burch, J., in commenting:

"That offenses must be of the same general character is not always a sound test of joinder. In this instance the two crimes charged were of the same general character, in that they both involved force and violence to the person.

That, however, would not necessarily be sufficient. To illustrate: As the culmination of a long standing quarrel about a line fence, a farmer kills his neighbor. He goes to town, and the same afternoon, while in an excited frame of mind, he becomes involved in an altercation about a business matter, and makes an assault with some kind of a deadly weapon with intent to kill. While the offenses are of the same general character, there *should be* separate informations and separate trials. The only reason this is so is, there would inevitably be some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity.

"The reason for separate charges and separate trials fails when the acts *constituting the crimes are linked together in a series in such manner they constitute one comprehensive transaction*, and this is true whether or not the crimes are of the same general nature. . . ." (pp. 61, 62.) (Emphasis added.)

The law might well have grown in this direction as it has in other jurisdictions. Cases dealing with the joinder of felonies which grow out of one comprehensive plan or design can be cited to support the proposition. It must be emphasized that these cases are supported only by the facts with which the court was then confronted. (*State v. Neff,* 169 Kan. 116, 218 P. 2d 248; *State v. Aspinwall,* 173 Kan. 699, 252 P. 2d 841; *State v. Aldrich,* 174 Kan. 335, 255 P. 2d 1027; and *State v. Martin,* 175 Kan. 373, 265 P. 2d 297.)

These cases do not deal with the precise question we now have before this court. It should be noted that these cases are authority for the joinder of felonies *whether they be of the same general character or not,* where the offenses constitute one comprehensive plan, transaction or where one offense is a corrollary to the other.

In the history of Kansas law we find in 1891 that this court in *The State v. Hodges,* 45 Kan. 389, 26 Pac. 676, established the law relative to the joinder of separate and distinct felonies charged in several counts of the information, provided, of course, that only one offense is charged in each of the several counts of the information. The court there speaking through Valentine, J., said:

". . . Several separate and distinct felonies may be charged in separate counts of one and the same information, where all of the offenses charged are of the same general character, requiring the same mode of trial, the same kind of evidence, and the same kind of punishment . . . The defendant may be tried upon all the several counts of the information at one and the same time, and in one trial; but all this rests in the sound judicial discretion of the trial court. In some cases the trial court might, without committing material error, quash such an information; or it might require the state to elect upon which one or more of the several counts it would proceed to trial

or rely for a verdict; but we cannot say that in this case the court abused its discretion or committed any material error." (p. 392.)

The foregoing proposition of law has been cited many times and followed in this court. (*The State v. Warner,* 60 Kan. 94, 55 Pac. 342; *State v. Powell,* 120 Kan. 772, 245 Pac. 128; re-hearing denied in *State v. Richardson,* 121 Kan. 722, 250 Pac. 313.)

The established law in Kansas is well stated in 42 C. J. S., Indictments and Informations, § 183, p. 1143, as follows:

". . . The rule now generally accepted is that, subject in most instances to the discretion of the trial court to compel an election, separate felonies of the same general nature may be charged in separate counts of the same indictment, in case they are triable in the same manner and punishable similarly . . ."

In *State v. Toelkes,* 139 Kan. 682, 33 P. 2d 317, this court said:

"So far as the joinder of separate offenses in the same information is concerned, the test is, Are the charges of the same general nature and will the joinder deprive the defendant of an advantage in the trial, or are they incongruous and repugnant in character and will they operate to deprive the defendant of some legal advantage? We see no reason why felonies and misdemeanors may not be joined where they are kindred in nature, as well as different felonies of like nature prosecuted in separate counts . . ." (p. 684.)

As heretofore quoted in the *Hodges* case this court adheres to the proposition that the question of joinder of separate and distinct felonies is largely a question of procedure, resting in the sound judicial discretion of the trial court, whether or not the rights of a defendant will be prejudiced by the trial of several charges at one time. (*State v. Odle,* 121 Kan. 284, 246 Pac. 1003; *Wiebe v. Hudspeth,* 163 Kan. 30, 180 P. 2d 315; *State v. Aspinwall,* supra; and 42 C. J. S., Indictments and Informations, § 183.)

With the foregoing law established in Kansas prior to the writing of the *Thompson* case, Burch, J., recognized the discretionary power in the trial court by using the word "should" in his dictum instead of a more commanding word. In fact, the *Thompson* case was written in 1934 and in the same year shortly thereafter the *Toelkes* case was written by Johnston, C. J., citing the *Hodges* case and the *Odle* case.

Turning our attention now to the instant case, let us examine the felony counts joined in the information. The counts charging the defendant with kidnaping in the first degree and with the rape of Mrs. Harris grew out of the same transaction and were part of the

same plan of the defendant in perpetrating the acts. These are properly joined with the count charging assault with intent to rape committed one week later. As between the first two and the latter, the offenses are of the same general character, requiring the same mode of trial, the same kind of evidence and the same kind of punishment. The trial of the defendant, therefore, on the several counts joined was within the sound discretion of the trial court and no error was committed by the trial court in overruling the defendant's motions.

Actually, the state was obligated to charge the defendant with each of these counts in one information, unless there was an intention to abandon the third count completely. G. S. 1949, 62-1449, provides as follows:

"When one is properly charged in one or more counts of a complaint, indictment, or information with an offense, or offenses, against any of the laws of the state, and upon the trial of the action evidence is admitted of other offenses which might have been included as other counts in the complaint, indictment, or information, or on which the state might have elected to rely in the action then being tried, a conviction or acquittal on the charge, or charges, as made in the complaint, indictment, or information, shall operate as a bar to any subsequent prosecution of the same person in another action for any act or acts for which the state could have asked for a conviction under the complaint, indictment or information in the former trial."

This statute was construed in *State v. Momb*, 154 Kan. 435, 119 P. 2d 544:

"It may have been the purpose and intent of the lawmakers to protect a defendant from the expense and harassing which results from prolonged criminal litigation in a multiplicity of actions when a single action might adequately serve the purpose. It may have been the thought of the lawmakers that the rule touching the purpose for which evidence of other similar offenses may be introduced did not always afford a defendant adequate protection before a jury. It may have been the legislative intent and purpose to protect the taxpayers against the mounting costs of needless criminal litigation. The wisdom of the enactment, however, or the legislative motive are not our concern. It is not our province to determine what the law should or should not be. It is our duty to ascertain and, if possible, to make effective the legislative will . . ." (p. 441.)

The confession of the defendant in the instant case included statements regarding all three counts of the information. A similar situation was presented in the case of *State v. Neff*, supra, where the court said in the fifth syllabus:

"Where proof of the commission of related and similar offenses consists in one written voluntary confession, on which the state must rely for con-

viction of each offense, *the state is not required to file separate informations on each offense* and thereby defeat a prosecution of the second offense by virtue of G. S. 1935, 62-1449." (Emphasis added.)

If the state used the confession as evidence it became mandatory, unless the state abandoned the third count, that all three counts be joined in one information. In the instant case all of the felonies charged could be properly joined, and the defendant was not prejudiced by the court's ruling on the defendant's motions to require the state to elect.

Prior to discussing the admission of the testimony of Mrs. Brakey given at the preliminary hearing, we shall consider a construction of the kidnaping statute, G. S. 1949, 21-449.

This is the first time this court has been directly called upon to construe and interpret the above cited statute concerning kidnaping in the first degree. Cases dealing with the construction of G. S. 1949, 21-450, kidnaping in the second degree, have been before this court. (*State v. Lammon;* 153 Kan. 822, 113 P. 2d 1052; and *State v. Myers*, 154 Kan. 648, 121 P. 2d 286.)

The defendant specified as error the giving of certain instructions by the trial court to the jury relating to kidnaping in the first degree. The defendant complains generally of the instructions throughout wherein kidnaping is referred to, but specifically objects to Instruction No. 5 which reads:

"5. Under Count 1 of the Information and the evidence in this case the defendant may be convicted of kidnaping in the first degree or he may be acquitted, as the jury may determine. The word 'kidnap' as used in these instructions means the taking, carrying away, and detention of a person against his will. It may be accomplished either by actual physical coercion or force to the body of such person, or by coercion of the will of such person by threats, fear, intimidation, or other inducements which deprive him of his will to resist. In this case the material elements of the offense charged in Count 1 are as follows:

"A. That on February 21, 1955, in Wyandotte County, Kansas,

"B. The defendant, Joseph Zebedee Brown, without lawful authority seized, confined, and carried away Mrs. Eva Harris against her will, and

"C. That while so confined, bodily harm was inflicted upon the said Eva Harris.

"If the State has not proved each of these elements to your satisfaction beyond a reasonable doubt, then you can not find the defendant guilty as charged in Count 1 of the Information. If you believe, however, from the evidence beyond a reasonable doubt that on February 21, 1955, the defendant, Joseph Brown, without lawful authority, did compel and coerce Mrs. Eva Harris by force, threats, intimidation, or otherwise to remain in her car and to accompany him to the place described in the evidence, against her will,

and if you further believe from the evidence beyond a reasonable doubt that while so confined against her will bodily harm was in any way inflicted upon her, then you should find the defendant guilty of kidnapping as charged in Count 1 of the Information."

The principal objection of the defendant is that kidnaping in the first degree defined by the statute hereinafter set forth embraces just one crime, which is kidnaping *with the intention of causing another to pay ransom or reward.* The defendant goes back into history as far as Moses wherein manstealing was denounced and made a serious crime punishable by death. (Ex. 21:16 and Deut. 24:7.) By this process the defendant, tracing the law of kidnaping through the civil law, the common law, and into the modern kidnaping statutes, endeavors to establish that statutes dealing with kidnaping are grouped into two types. The first includes the words "reward or ransom" and limits the offense to extortion generally, and the second type prescribes and punishes any "forcible taking away" for whatever purpose. Defendant points out that the kidnaping statute under which he is charged, G. S. 1949, 21-449, was adopted by the legislature of this state in the year 1935, which was just a few years after the enactment of the original Lindbergh law by Congress in 1932, which was amended in 1934. This federal law grew out of the Lindbergh kidnaping case where ransom was the motive and the victim was taken from one state to another.

The original Kansas kidnaping law was very general in wording and very broad in its application. In substance, it provided that every person who shall without lawful authority forcibly seize or kidnap any other person with intent to cause such person to be sent or taken out of the state, or to be secretly confined within the state against his will, or in any way held against his will, shall upon conviction be punished by confinement at hard labor not less than five nor more than ten years. The gist of the offense under the old law was the unlawful seizure, taking, detention, concealment or carrying away of the kidnaped person.

This act was broad enough to include any purpose of kidnaping which the perpetrator might consider of sufficient benefit to himself to induce him to undertake the kidnaping.

G. S. 1949, 21-449, makes kidnaping in the first degree punishable by life or not less than twenty years imprisonment in the penitentiary at the option of the court or the jury trying the case. For purposes of clarity in further discussion we have separated certain

clauses of the statute by inserting the numbers (1), (2), (3) and (4) in the statute which provides:

"If any person or persons [1] shall willfully, without lawful authority, seize, confine, inveigle, decoy, kidnap or take or carry away by any means whatever, any person or persons or cause such child or person or persons to be secretly confined against his will, [2] for the purpose and with the intention of causing the father or mother or any other relative of the person so kidnaped, or any other person, to pay or offer to pay any sum as ransom or reward for the return or release of any person or persons, [3] or if bodily harm is in any way inflicted upon the person or persons so kidnaped, [4] said person or persons so guilty of the above-mentioned acts or act, shall, on conviction, be deemed guilty of kidnaping in the first degree . . ."

The statutory enactment in 1935 broke down the offense of kidnaping into three degrees. The original kidnaping act of 1868 as it appears in R. S. 1923, 21-438, was changed and re-defined into first and second degree kidnaping. R. S. 1923, 21-440, was re-enacted with some changes, increasing the penalty, and re-defined as kidnaping in the third degree.

In an effort to ascertain the reason as well as the meaning of a criminal statute, a court may resort with propriety to the evil which the statute was designed to remedy. For this it will look to the contemporaneous events and situation that existed at the time the statute was pressed upon the attention of the legislature. (*Holy Trinity Church v. United States*, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; and *United States v. Union Pacific R. R. Co.*, 91 U. S. 72, 23 L. Ed. 224.)

"It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislature intended to include the particular act . . ." (*Holy Trinity Church v. United States*, supra, p. 459.)

Application of the foregoing rule of construction is significant in that we must know how much to read out of G. S. 1949, 21-449, on the ground that a literal application of the words would lead to absurd consequences. Thus, under provision No. 1, the repeated use of the disjunctive "or" leads to numerous possibilities far removed from kidnaping. For example, a literal application of a

certain word arrangement would define what normally constitutes an act of simple assault as kidnaping in the first degree. This construction is absurd and clearly not the legislative intention. Generally criminal statutes are to be strictly construed in favor of the accused. (*State v. Bowser*, 158 Kan. 12, 145 P. 2d 135.) In a strict construction of a penal statute a presumption exists that the legislature intended exceptions to its language which would avoid results of injustice, oppression or an absurd consequence, since the reason for the law in such case prevails over its letter.

In *State v. Waite*, 156 Kan. 143, 131 P. 2d 708, this court in explaining the strict construction rule regarding penal statutes said:

". . . For reasons which stem from our fundamental concepts of individual human rights a criminal statute should not be extended by courts to embrace acts or conduct not clearly included within the prohibitions of the statute . . ." (pp. 145, 146.)

A reasonable construction must be given criminal statutes to promote the efficient enforcement of the criminal law, to prevent crime and to promote the ends of justice. The object of statutes prohibiting kidnaping is to secure the personal liberty of citizens and to secure to them the assistance of the law necessary to release them from unlawful restraint. (*State v. Myers*, supra; and *Macomber v. State*, 137 Neb. 882, 291 N. W. 674.)

The element of "intent" in a kidnaping statute is treated in 31 Am. Jur., Kidnapping, § 8, p. 815, where it is said:

"Whether criminal intent is the dominating element in the crime of kidnapping depends upon the language of the particular statute involved; the statutory definitions of kidnapping vary greatly in phraseology and meaning. Under some, the gist of the offense is the act of forcibly seizing, carrying away, imprisoning, or secreting any person without authority of law; under such a statute the criminal intent necessary to the existence of the offense is implied in the prohibited act. Under other statutes, the dominant element of the offense is the intent with which the acts enumerated in the statute are committed. The particular intent of the kidnapper is immaterial, unless it is required by statute that the taking must be for such an intent as concealment, sending out of the state, extortion, or robbery, etc. Where a particular intent is required, the taking or detaining must be for one of the prohibited purposes."

The defendant argues that the words "so kidnaped" used in provision No. 3 in G. S. 1949, 21-449, above quoted, refer to an offense described by provisions No. 1 and No. 2 in the statute. In other words, the defendant argues that the kidnaping must have been done with the intention of exacting ransom or reward before the provision relating to bodily harm has application. This con-

struction would nullify provision No. 3 in the statute since the crime of kidnaping in the first degree would be complete under provisions No. 1 and No. 2 without provision No. 3.

The word "kidnap" has a technical meaning. It is derived from the common law, and must be interpreted in the light of its technical meaning in common law. Both under the common law and under a statute, unless clearly modified, it means to take and carry away any person by unlawful force or by fraud, and against his will.

By provision No. 4 the prohibited acts are made kidnaping in the first degree. Provision No. 1 is designed to define kidnaping in the statute. Significantly contained within the wording of both provisions No. 2 and No. 3 are the words "so kidnaped." These words are important because they specifically have reference to provision No. 1 only, which defines kidnaping.

This leads to the conclusion that the provisions of G. S. 1949, 21-449, denounce two acts as kidnaping in the first degree. The one is kidnaping with the intention of exacting ransom or reward and the other is kidnaping if bodily harm is in any way inflicted upon the person or persons kidnaped. The dominating element of the offense in the former is the intent with which the act is done, while in the latter the gist of the offense is the actual inflicting of bodily harm upon the person kidnaped. There the criminal intent necessary to the existence of the offense is implied in the prohibited act. (State v. Myers, supra; 114 A. L. R. 870.)

The situation which existed at the time the Kansas legislature passed the act under consideration has a definite bearing upon the act adopted. Public feeling was tense. Charles A. Lindbergh was the first flier to cross the Atlantic Ocean non-stop. While exceedingly popular in this country his eldest son of tender years was kidnaped, taken across a state line and held for ransom. When the boy was eventually found he was dead. Newspaper publicity was carried daily in headlines on the front page throughout the nation as to progress and reports on the case. It began with the events of the kidnaping and continued through the trial of the offender. As an outgrowth of the case the federal law directed against kidnaping commonly known as the "Lindbergh Law" was enacted. Kansas followed by strengthening its kidnaping law, and it was without doubt the intention of the legislature to denounce two acts in the statute as kidnaping in the first degree.

A California kidnaping statute provided the death penalty for kidnaping if a person suffered bodily harm and that statute was held to be valid notwithstanding the fact that it was enacted allegedly as a result of an aroused public feeling against kidnaping. In *People v. Tanner*, 3 C. 2d 279, 44 P. 2d 324, the California court spoke of "bodily harm" in the following language:

"It is the contention of appellants that no bodily harm was suffered by any of the parties against whom the crime was committed. It will be noted that the statute does not use the words actual bodily harm, or great bodily harm, or bodily injury. . . . *Bodily harm* is generally defined as 'any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person.' (8. C. J. 1134; *People v. Moore*, 50 Hun (N. Y.), 356 [3 N. Y. Supp. 159]; 1 Words and Phrases, p. 817; *King v. Hostetter*, 7 Canadian Criminal Law, 221.). . . ." (p. 297.)

Bodily, used singly, is defined as pertaining to the body. ". . . It is opposed to mental . . . physical is often synonymous with bodily; as, physical discomfort, physical suffering . . ." Harm is defined as "1. Injury; hurt; damage; . . . 2. Grief; pain, sorrow. 3. Evil; wrong; wickedness." (Webster's New International Dictionary, Second Edition.)

It was held in *People v. Brown*, 29 C. 2d 555, 176 P. 2d 929, that any touching of a victim against her will, with physical force, in an intentional, hostile and aggravated manner, or the projecting of such force against the victim by the kidnaper is "bodily harm" within the meaning of the statute providing the death penalty if the person kidnaped suffered bodily harm. There the defendant was convicted of robbery in two counts, of rape and of kidnaping for the purpose of robbery. That court said the forcible rape itself constituted bodily harm.

We are in full accord with the position taken by the California court in the *Tanner* and *Brown* cases.

Other cases dealing with the California kidnaping statute are: *People v. Chessman*, 38 C. 2d 166, 238 P. 2d 1001; *People v. Mendoza*, 122 C. A. 2d 185, 264 P. 2d 223; and *People v. Thompson*, 133 C. A. 2d 4, 284 P. 2d 39.

In *People v. Florio*, 301 N. Y. 46, 92 N. E. 2d 881, the New York court held that kidnaping and abduction of a woman were separate offenses.

The fact that rape in the instant case must be construed to supply the element of bodily harm required by the kidnaping statute

is no obstacle to a prosecution for both offenses in the criminal law. (See annotation in 17 A. L. R. 2d 1003.) In the case of *Wagner v. Edmondson*, 178 Kan. 554, 290 P. 2d 98, it was held by this court that the test concerning whether a single transaction may constitute two separate and distinct offenses is whether the same evidence is required to sustain each charge, and if not, the fact that both charges relate to and grow out of one transaction does not make a single offense where two distinct offenses are defined by the statute. (See, also, *Wiebe v. Hudspeth*, supra.)

Under all of the facts and circumstances presented by the record before this court, we are of the opinion that the trial court properly instructed the jury on kidnaping in the first degree. The instruction was properly limited to such matters as were before the jury on the evidence presented.

Defendant next argues that if it was proper to give an instruction on kidnaping in the first degree, the court should also have instructed on kidnaping in the second degree which is defined in G. S. 1949, 21-450, even though no request was made for such instruction by the defendant. A careful examination of the record before this court in the instant case does not disclose any evidence which would justify the trial court in giving an instruction concerning kidnaping in the second degree. The defendant was either guilty of kidnaping in the first degree under the evidence or he was not guilty of kidnaping in any degree. The defense was concentrated on alibi.

We shall next consider the admission into evidence of the transcript testimony of Mrs. Brakey given at a preliminary hearing where the defendant was confronted by the witness and cross-examined her.

On this point defendant specified as error the admission of the testimony of Mrs. Ruth M. Brakey: To be read from the transcript to the jury; to remain in the record after timely objections to the same; in refusing to declare a mistrial; in ruling that the testimony of Mrs. Brakey was not available on the day the transcript was read to the jury; and in overruling the defendant's motion for a new trial.

Prior to the admission of testimony given in a prior hearing two requirements are essential—first, that the testimony at the prior hearing be given under oath, and second, that the defendant be confronted by the witness at the prior hearing and have the right

to cross-examine. (*The State v. Wilson*, 24 Kan. 189; *The State v. Simmons*, 78 Kan. 852, 98 Pac. 277; and *State v. Foulk*, 57 Kan. 255, 45 Pac. 603.)

The first syllabus in the case of *The State v. Nelson*, 68 Kan. 566, 75 Pac. 505, reads:

"The fact that a witness against the defendant in a criminal case is outside of the state at the time of the trial, and therefore beyond the reach of process, authorizes the introduction in evidence of the testimony given by the witness at a former trial of the same case, *notwithstanding an opportunity to subpoena the witness may have been neglected by the prosecution.* The requirement of the bill of rights that the accused shall be allowed to meet the witness face to face is complied with in that he has already at the former trial been confronted by the absent witness, and at the later trial meets the witness who gives evidence of what such former testimony was." (Emphasis added.)

The admissibility of the testimony of a witness at a former trial does not depend so much on the presence or the availability of the witness as it does on the availability of the testimony, such as where a statutory privilege is claimed because of relationship to the accused, (*The State v. Stewart*, 85 Kan. 404, 116 Pac. 489; and *State v. Woods*, 130 Kan. 492, 287 Pac. 248) or where a witness is excused from testifying on the ground his testimony would incriminate him. (*State v. Helbert*, 135 Kan. 726, 12 P. 2d 726; and *State v. Neff*, supra.)

In the instant case it cannot be denied that the witness, Mrs. Ruth M. Brakey, was under oath or that the defendant had a right to cross-examine the witness at the preliminary hearing. What is of greater concern, however, is whether or not the testimony of the witness was available. This is dependent upon the foundation laid for the admission of such testimony at the trial of the defendant.

It must be made to appear that the witness who gave such testimony at the former hearing cannot by the exercise of reasonable diligence be produced. (*The State v. McClellan*, 79 Kan. 11, 98 Pac. 209.) In the *McClellan* case this court spoke of the rule as follows:

"Other causes for the use of such evidence than those enumerated may, in some cases, be sufficient; but as a general rule it may be said that whenever it is reasonably possible to produce the living witness it should be done. The right of every litigant to meet the important witnesses of his adversary face to face, whenever and wherever their evidence is likely to affect his material interests, is recognized by all practicing lawyers to be of inestimable value. This is especially true of defendants in criminal cases, and they should

receive reasonable protection in this respect, even when, as in this case, their constitutional right to meet the witnesses against them face to face has been exercised by a cross-examination of the witness at his previous examination. The right to have all adverse witnesses testify personally exists independent of the constitution, and the spirit of common fairness which pervades all courts of justice is a sufficient guaranty that it will be recognized and enforced. In legal theory it may be presumed that witnesses will always tell the same story when under oath, but, in practice, we know they do not. Mental confusion, lapse of memory, and other circumstances existing when a witness testifies, may give color to his evidence which subsequent reflection will change materially. Because of this fact, familiar to all lawyers, parties often prefer to use the former testimony of a witness rather than take the hazard of a reexamination. This should not be permitted when the witness can be produced. For a full discussion of this question, and an elaborate citation of authorities, see *Railroad Co. v. Osborn,* 64 Kan. 187, 67 Pac. 547; *The State v. Nelson,* 68 Kan. 566, 75 Pac. 505; *The State v. Harmon,* 70 Kan. 476, 78 Pac. 805." (pp. 12, 13.)

Regarding the fact that a proper foundation must be laid and that it must be shown to the satisfaction of the court that due diligence has been exercised to secure the presence of the witness, the following language appears in *State v. Carter,* 149 Kan. 295, 87 P. 2d 818:

"Did appellants meet the requirement? We do not think so. There was nothing before the court to justify admission of the transcript except the bare statement of counsel that the witness 'is now a resident of the state of Missouri and out of the jurisdiction of this court.' No proof of any sort in support of the statement was offered. No facts tending to establish his absence from the state were submitted. There is nothing to indicate that any effort had been made to secure the presence of the witness except the praecipe directing that subpoena be served *at the courthouse on the day of the trial.* The praecipe was tantamount to telling the sheriff that he need not look for the witness anywhere else or at any other time." (p. 297.)

The query, therefore, is whether the state in the instant case laid a proper foundation for the admission of the transcript testimony of Mrs. Ruth M. Brakey.

After the assistant county attorney, Mr. George, finished with his last witness in the prosecution's case before the trial court, he made this statement out of the hearing of the jury:

"Mr. George: Our next witness is in Missouri and not subject to subpoena, and we would like to introduce the testimony at once of Mrs. Ruth Brakey. If counsel is going to object to that, we should argue it out of the presence of the jury. If we have a recess we might do it before the jury returns.

"Mr. Hayward: You know I am going to object.

"The Court: All right, we will have a recess.

"(Jury dismissed for recess.)"

Many pages in the abstract of the record before this court consist of colloquy between court and counsel concerning the efforts made to procure this witness. Briefly summarized, they amount to the fact that Mrs. Brakey worked at a department store in Kansas City, Kansas; that she was highly nervous and temperamental; that the deputy sheriff had served a subpoena by leaving it with Mrs. Brakey's employer at Maslan's Department Store where she worked in Kansas City, Kansas, while Mrs. Brakey was out at lunch; that the assistant county attorney was in contact with Mrs. Brakey by telephone on several occasions; that Mrs. Brakey lived in Kansas City, Missouri, and on the day that her testimony was to be given refused to come to Kansas; that the attempted service of the subpoena was made approximately one week prior to the presentation of the prosecution's case; and that Mrs. Brakey's doctor who resided in Kansas City, Missouri, submitted a letter through Mrs. Brakey to the assistant county attorney stating that Mrs. Brakey should not be subjected to any conditions which excited her.

Further conversations took place on January 31, 1956, as follows:

"The Court: When did you last see her [Mrs. Brakey]?

"Mr. George: I believe it was Monday I was talking to Mrs. Brakey [January 23, 1956].

"The Court: Where?

"Mr. George: At Maslan's where she is employed. She told me then she would like to come in but her health would not permit it, and she had a letter from her doctor.

"Mr. Hayward: A subpoena could have been served.

"The Court: That was Monday a week ago that you went down and asked her to come in, and she indicated she would or would not?

"Mr. George: She indicated she could not because of her health.

"The Court: Did she say she couldn't?

"Mr. George: I said that. She said then, 'I will be glad to come up and point him out and identify him, *but I will not take the stand and go through Mr. Hayward's cross-examination.*' I told her we were going to issue a subpoena for her and would expect her to testify.

"The Court: Did you issue a subpoena?

"Mr. George: Yes, sir, a subpoena was issued, Mr. Brown took the subpoena to Maslan's.

"Mr. Thornton Brown, Deputy Sheriff: Yes.

"The Court: What do your records show?

"Mr. Thornton Brown: My record shows I received the subpoena on 1-25-56. I served the subpoena 1-25-56 on Mr. Maslan, the boss of the dry-goods store. He said the lady was out to dinner. I asked him would he accept service, and I wrote down here, 'Served on Mr. Maslan, boss of store, personal service, Sixth and Minnesota Avenue.'" (Emphasis added.)

Counsel for the defendant repeatedly objected throughout the trial to the admission of the transcript testimony of Mrs. Brakey who was a complaining witness. On the 7th day of February, 1956, counsel for the defense informed the court that he had information that Mrs. Brakey had consistently been at her work at Maslan's Store in Kansas City, Kansas, since the date upon which she was to testify, and had been there before that date. Unexpectedly on the afternoon of the 7th day of February, 1956, the state produced Mrs. Ruth M. Brakey who was present in the courtroom. The defendant was interrupted in the presentation of his case to the jury when one of the assistant county attorneys announced that he had brought in Mrs. Brakey. He requested that her testimony should then be taken. That is, that defendant's counsel should then withdraw his witness and let Mrs. Brakey testify. This placed the defendant in a very precarious position. If the defendant objected to her testimony it would be prejudicial to his cause, and if he did not object it would be prejudicial in that the testimony of Mrs. Brakey would be before the jury on two different occasions, once as part of the prosecution's case by transcript testimony, and again in the middle of defendant's case by the direct testimony of the witness. Furthermore, the state brought Mrs. Brakey into the courtroom and had her seated there while the rule was invoked that witnesses were to be separated from the courtroom. This was unknown to the defendant until the state announced that they had Mrs. Brakey in the courtroom to testify.

Counsel for the defendant objected to the interruption and to the admission of the testimony of Mrs. Brakey in person during the defendant's case. He moved the court to discharge the jury and declare a mistrial. The trial court sustained the objection to Mrs. Brakey testifying but overruled defendant's motion for a mistrial.

The foregoing facts represent the substance of the statements made by counsel for the state. They were made for the purpose of establishing a foundation for the admission of the testimony of Mrs. Brakey by transcript as given at the preliminary hearing. Statements of counsel, however, are not evidence any more than are the opening statements of counsel in the presentation of a case before a jury or to the court. The foundation, which the law contemplates, is a *foundation in evidence. It is proof that is required.* Proof that due diligence has been exercised and that the testimony of the witness is not available. A proper foundation for the intro-

duction of testimony of the character now under consideration required that the assistant county attorney and the deputy sheriff, as well as the other necessary witnesses, testify under oath with respect to the facts relied upon as the foundation, giving the defendant full opportunity to cross-examine. In addition, documentary evidence relied upon for the foundation should be properly introduced in evidence. (*State v. Carter,* supra.)

In a recent case, *In re Estate of Snyder,* 181 Kan. 222, 310 P. 2d 944, this court upon motion of the appellee struck an abstract from the files of this court wherein the appellant's version of the evidence was narrated from statements of counsel made in the trial court.

In the instant case the only evidence before the court was that presented by the defendant, when he called Dr. R. L. Edwards, Jr., of Kansas City, Missouri, to the witness stand to testify. He was the doctor of Mrs. Brakey and testified that he did not at any time advise Mrs. Brakey that she should not appear in court, although he did say from a nervous standpoint she was not able to appear in court. He further acknowledged that he had written a letter for the county attorney several months prior to the date of his testimony concerning Mrs. Brakey.

It was improper for the trial court to admit the testimony of Mrs. Brakey as given at a former hearing without a proper foundation. To admit such evidence, particularly of a complaining witness, was materially prejudicial to the substantial rights of the defendant. Aggravating the prejudice was the effort made by the state to have Mrs. Brakey testify in person as a witness during the presentation of the defendant's case. Such interruption was highly prejudicial. Counsel for the defense had no legal avenue from which to extricate the defendant from the predicament.

Taking into consideration all of the facts and circumstances presented by the record in this case, we are of the opinion that the introduction of testimony of the character now under consideration without proper foundation resulted in reversible error and requires the granting of a new trial.

The judgment is reversed and the cause remanded with directions to grant a new trial.

Wertz, J., dissents from paragraph 7 of the syllabus and the corresponding portion of the opinion, and would affirm the judgment *in toto.*