No. 47,554

STATE OF KANSAS, *Appellee,* v. KENNETH WARREN BARRY, *Appellant.*

(533 P. 2d 1308)

Opinion filed April 5, 1974.

*Kenneth E. Peery*, of Concordia, argued the cause and was on the brief for the appellant.

*William J. Walsh*, county attorney, argued the cause, and *Curt T. Schneider*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: After a trial to the court Kenneth Warren Barry was convicted of aggravated kidnapping and sentenced to life imprisonment. He appeals, designating twenty-two points on appeal. Several of these encompass more than one claim, so that in all he alleges sixty-seven trial errors. In particular he complains of allegedly illegal searches and of the use of his confession. We have examined each of defendant's allegations and find none which warrants reversal, either singly or in combination.

The charge against defendant stemmed from the abduction from Concordia and subsequent rape of a twelve year old girl on May 31, 1972. (The victim is termed "Miss K." throughout the record and briefs, and we shall also employ that pseudonym.) The defense was aimed first at destroying the state's evidence identifying Barry as the perpetrator of the crime, and second at showing lack of responsibility because of insanity or diminished responsibility because of intoxication. At the conclusion of the trial the trial court, in addition to a general finding of guilt, specifically found that defendant was sane at the time the crime was committed and was not voluntarily or involuntarily intoxicated, "at least not to the extent defendant was incapable of knowing or understanding the wrongfulness of his conduct or of conforming his conduct to the requirements of law."

The evidence, which was contested in some instances on grounds of admissibility but was not otherwise disputed, established the following sequence of events:

On the evening of May 30, 1972, John R. Wilson checked into a motel in Riverside, Missouri, a suburb of Kansas City. He was a college student who had just arrived for a summer job in Kansas City, and had virtually all his belongings with him. Shortly after his arrival at the motel he was engaged in conversation by his next door neighbor, a man he described as 50 to 55 years old. Shortly after that the neighbor robbed him at gunpoint. After tying Wilson up his assailant relieved him of his billfold and his car keys. In a little bit Wilson heard him drive away in his car.

The car was a 1969 Chevrolet Caprice, yellow with a black vinyl

top, bearing 1972 Missouri tags K4M-950. The front tires were brand new "Colts." Across the back seat was a travel rod from which hung fifteen or twenty shirts, trousers and sport coats. The trunk contained a vacuum cleaner, a footlocker, baseball bats and gloves, fishing tackle, and a rifle.

The next day, May 31, at about 10:00 a. m., Miss K. was accosted on the street in Concordia by a man who wanted her to do some modeling—he assured her she could clear it with her mother. She got in his car and he drove to the outskirts of Concordia. There he produced a pistol and told her to get down on the floorboard or he would put a bullet through her head; she complied. He then drove north out of town on U. S. highway 81 and, after crossing the Republican river, onto a country road. There he raped her for the first time in the front seat of the car. It hurt and she bled.

He drove on for a time on dirt roads and then stopped again. He tied Miss K.'s hands with her pantyhose and put her in the trunk, where she observed among other things a vacuum cleaner, a footlocker, a baseball bat and a rifle. He then returned to the highway and continued north into Nebraska. There he removed Miss K. from the trunk and had her ride again in the front seat. At one point he again turned off the highway and again raped her, this time on the grassy ground. After that he drove down the highway again and eventually turned off into an abandoned farmstead. There he put her into an empty shed or corn crib, tying her hands behind her with a torn-up shirt. She was tied in a sitting position, with her hands fastened to a brace wire. He left, and she remained there for, in her estimate, an hour or two.

Eventually her shouts attracted the attention of a farmer who had been cultivating corn in a nearby field. He investigated, found Miss K. tied to the wall of the shed, and promptly called the sheriff's office in Geneva, Nebraska. His call was received at 3:30 p. m.

Sheriff Olson and a deputy proceeded to the scene, arriving 15 minutes later. The farmstead is some 10 miles north of Geneva, the Fillmore county seat, and about 2 miles north of Fairmont. The shed was 150 to 200 feet from U. S. 81. The officers first photographed Miss K. and then released her. They also photographed the only set of automobile tire tracks found in the farmyard, and determined that the automobile which made them had turned north on highway 81. They then took Miss K. to a doctor in Geneva, who in turn took her to the county hospital where he examined her.

In the meantime, on highway 81 just three miles north of Fairmont and just one mile north of the shed, Trooper Albert Wise of the Nebraska state patrol was operating a traffic speed check. At about 2:00 p. m. he clocked a car going north at 72.6 miles per hour in the 65 mile zone. He promptly gave chase with red light and siren in full operation. The car accelerated, and there followed a chase of about 14 miles at speeds up to 110 miles per hour. The pursued car took first to the center and then to the left side of the road, putting oncoming traffic into the ditches.

Trooper Wise radioed for help, and eventually secured the services of two officers from the York county sheriff's office. These officers met the two vehicles involved in the chase just south of York. Having no time to establish a roadblock, they pulled their car over and stood out in the highway. The lead car began to slide, turned broadside, and went off the road to the left or west side into the ditch.

Trooper Wise pulled up behind the car, jumped out and went around to the right-hand side and covered the driver with his gun. The two deputies came up on the driver's side with their guns drawn and pulled the driver from the car. As they turned him Trooper Wise saw a pistol in his belt. The officers immediately threw him to the ground, removed the pistol, and handcuffed him. They then searched him and placed him in the patrol car.

Trooper Wise then conducted a search of the prisoner's car. In the front he observed several items of ladies' clothing—pantyhose, a bra, a shoe. In the back there was clothing hanging up. In the trunk was a rifle, a baseball bat, and a trunk. The license was a 1972 Missouri tag, K4M-950.

The prisoner refused to reveal his name or say where he was going or what he was doing, but complained of his head hurting him. The driver's license in his billfold bore the name "John R. Wilson," the victim of the previous night's robbery.

Two of the officers transported the prisoner to the sheriff's office in York, arriving around 2:30 to 2:45. The third officer stayed with the car and supervised its towing to a locked garage in York. At the sheriff's office the suspect went down on his knees and wouldn't get up, so the officers carried him into the office. After talking to the county attorney Trooper Wise read the suspect his constitutional rights. He ignored the officers' questions, his only response being to complain of his head and pain.

After some 45 minutes, on the advice of the county attorney, the

officers secured an ambulance and had the suspect taken to a medical clinic. There he was stripped to his shorts, and in his clothes was found an application for a Missouri driver's license with the name "Kenneth Barry" on it. This led in time to the identification of the suspect as the defendant in this case. A check with the National Crime Information Center revealed that Barry was wanted in Missouri for rape and armed robbery.

The doctor who examined the defendant, Dr. Michael Breiner, found no injuries and no evidence of the presence or use of drugs or alcohol. His blood pressure was normal, although his heart beat was fast (92 per minute). His breathing was at a normal rate but irregular. He was perspiring a bit more than normal, but not enough to concern the doctor. The pupils were slightly dilated but equal, which ruled out "excessive or tremendous amounts of drugs." The doctor concluded that the defendant was suffering some apparent emotional distress with possibly some hyperventilation as a result. He was not in need of treatment, but the doctor directed the injection of a placebo—consisting of a pure saline solution—to alleviate the emotional condition.

The doctor also found a small spot of dried blood on the defendant's undershorts. Careful examination of the defendant's person revealed no possible source of this blood. He revealed no evidence of bleeding.

Dr. Breiner thought Barry should be under medical observation. Since there were no secure medical facilities in York, the officers arranged for the ambulance to take him to the hospital at the state penal complex at Lincoln, some 45 or 50 miles away. He was received there about 4:30 p. m., stripped of his clothing, and put in bed in a locked hospital room.

At about this time, down in Geneva, Sheriff Olson and his deputy were arriving at the doctor's office with Miss K. The sheriff's office there had monitored the high speed chase on the radio, and the police mind began to click. Miss K. was positive the car she had been abducted in was a Caprice—the York sheriff's office reported that the car in their custody was a Caprice. The Geneva officers went to York to examine the car, and particularly the tires. An external examination was made at about 5:15. The Geneva officers then returned to their office, where Miss K.'s statement was recorded. Her father had arrived from Concordia and was present at that time.

In her statement Miss K. described the car as being yellowish-

green with a dark blackish-brownish top. The word "Caprice" was on the glove box. She also described the contents of the car's trunk where she had been confined as including vacuum cleaner attachments, a footlocker, a baseball bat, and a "shotgun." The back seat contained around a dozen coats and shirts and ties. She mentioned that some of her own clothing was left in the car, including her pantyhose, bra and shoes.

Investigator Ronald Fink of the Nebraska state patrol had entered the case to assist Trooper Wise just after the defendant was examined by Dr. Breiner. Fink assisted in transporting him to Lincoln, and later in confirming the defendant's identification. He also traced the owner of the 1969 Caprice through the Missouri state patrol. By 7:00 that evening he was talking on the telephone to John R. Wilson, confirming the identification of the car and securing a rather complete inventory of its contents. Wilson asked Fink to go through the car and see what might be missing.

Armed with Wilson's permission, his inventory, and the description of the contents given by Miss K., Investigator Fink went around 9:00 p. m. to examine the car. He was accompanied by Trooper Wise, Sheriff Olson, Miss K. and her father. The officers found, sure enough, the pantyhose, bra, shoe, footlocker, baseball bat, and a seat full of clothes.

The following morning, June 1, 1972, Fink accompanied Lt. Lynn V. Parks, also of the Nebraska state patrol, when he interviewed defendant at the Lincoln penal complex hospital. Parks fully advised him of his rights, and defendant said he understood them. He declined Park's offer to call his wife saying "she couldn't help him in this situation." When asked, Parks told defendant he was being held on the Kansas City, Missouri, charges of rape, robbery and auto theft. No Kansas or Nebraska charges had yet been filed, although they would be later that day. Defendant talked freely about his past criminal history, but he made no statements which incriminated him in the present crime or in the Nebraska rape.

Back in Kansas the present case was initiated that day by the filing of a complaint charging defendant with aggravated kidnapping. Agent Raymond D. Macey, of the Kansas bureau of investigation, proceeded to Lincoln to investigate. There, on June 2, 1972, he interviewed the defendant commencing about 9:35 a. m. The first thing defendant wanted to know was which state had precedence, Kansas or Nebraska. As Macey recounted it, "I told him that he was in Nebraska and it had precedence but that I

wasn't positive about this. Barry asked about what would happen if he were convicted in Nebraska and then went to Kansas. I told him that if the charges still stood in Kansas, he would be brought to Kansas, stand trial and then be brought back to Nebraska. Then he asked if the Kansas charge was a capital offense and how execution was handled. I told him that it was a capital offense and execution was by hanging." (This, it will be noted, was prior to *Furman v. Georgia,* 408 U. S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.)

Macey then explained defendant's rights to him, read him a waiver form and secured his signature (in two places) at 9:50 a. m. Defendant did not read the form himself because he didn't have his glasses with him. This fact was specially noted on the back of the form, together with a reiteration that he did understand his rights, and yet a third signature of defendant was affixed to the back. At that interview defendant talked about other troubles he had had, but denied any recollection of Concordia or any dealings with Miss K. The interview terminated shortly after 11:00 a. m.

At 2:00 that afternoon, just as Agent Macey was preparing to return to Kansas, defendant sent word that he wanted to see him again. Defendant was brought to the patrol office where his rights were again read to him and a second waiver signed. What defendant asked was that he be returned to Kansas and that he be treated fairly, with no harassment. The following exchange took place:

"[Macey]: Nobody is going to harrass you, nobody is going to mistreat you. You're going to be treated as a prisoner.

"Barry: That's alright, I can handle that.

"[Macey]: A felony, under this specific charge.

"Barry: I can handle that but I'll get to be, just I'll be treated fairly as a prisoner, right?

"[Macey]: I'll guarantee that."

Defendant then proceeded to confess in some detail to the abduction and rapes described above. This entire conversation was tape recorded and a verbatim transcript was introduced at trial.

On Monday, June 5, 1972, defendant was arraigned in the Fillmore county court on Nebraska felony charges of rape, sodomy and fugitive carrying a concealed weapon. A Nebraska attorney was appointed to represent him at that time. On June 28, Nebraska waived its prior jurisdiction, defendant formally waived extradition in court at Lincoln, and was returned to Concordia. He was taken

before the county court of Cloud county that morning, where present counsel was appointed.

Defendant's first point on appeal is that his statements should not have been admitted into evidence. On his pretrial motion to suppress the trial court held an extensive evidentiary hearing and concluded by overruling the motion. That ruling is binding on us if a finding of voluntariness is supported by substantial competent evidence. *State v. Wilson,* 215 Kan. 28, 523 P. 2d 337. We think it apparent from the foregoing recital of evidence, nearly all of which was produced at the pretrial hearing, that the record amply supports such a finding. He was repeatedly advised of his rights, and the assurance that he would be properly treated as a felony prisoner is surely not an undue inducement to confess. He nevertheless contends that the delay from his hospitalization Wednesday night, May 31, to his presentment to the Nebraska magistrate on Monday June 5, vitiates his intervening confession. He cites no authority to support his contention and we are aware of none. There is no question but that during this period defendant was entitled to the assistance of counsel, but "[a]n accused may effectively waive the right to have counsel present during police interrogation after, as well as before, formal charges are filed against him." (*State v. Melton,* 207 K. 700, 486 P. 2d 1361, Syl. ¶ 3.) Defendant was repeatedly advised of his right to appointed counsel before talking to the officers and he repeatedly waived that right. The final interview with Macey in which he confessed was admittedly at his own request. There is nothing to show that the confession was involuntary, and the court did not err in admitting it.

His next two points claim illegal searches of the automobile and of his person. These issues were also resolved against him after hearing on his pretrial motion to suppress, and properly so. The high speed chase and the presence of the pistol at defendant's waist gave the officers ample probable cause to make the arrest (*State v. Tygart,* 215 K. 409, 524 P. 2d 753; *State v. Atkinson,* 215 Kan. 139, 523 P. 2d 737; *State v. McCollum,* 211 Kan. 631, 507 P. 2d 196), to search him (*State v. Hazelwood,* 209 Kan. 649, 498 P. 2d 607; *United States v. Edwards,* 415 U. S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234; *United States v. Robinson,* 414 U. S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467) and to search the car either as an incident to the arrest (*State v. Tygart,* supra; *State v. Atkinson,* supra; *State v. Moretz,* 214 Kan. 370, 520 P. 2d 1260) or wholly independently of the arrest (*State v. Colin,* 214 Kan. 193, 519 P. 2d 629; *State v. Undorf,* 210 Kan. 1,

499 P. 2d 1105; *State v. Robinson*, 203 Kan. 304, 454 P. 2d 527; *Chambers v. Maroney*, 399 U. S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975). Under the cases cited it was proper to search the car out on the highway and after it was towed to York, and it was proper to search the defendant's person and clothing. None of the information derived from these searches was tainted in any way.

In his next three points defendant contends that all of Miss K.'s testimony, and in particular her identification of him, should have been suppressed and stricken from the record. Further he says, without her testimony there was insufficient evidence at the preliminary hearing to bind him over for trial in the first instance. His general objection to her competence is based on the fact that between the date of the crime, May 31, 1972, and the preliminary hearing on September 27, 1972, she had obviously discussed the case with many people, and in later recounting the events had difficulty in determining whether some details were the product of her independent recollection or the suggestion of family, friends or police. As to the identification, her first descriptions of her assailant were vague and general. Nevertheless she positively identified defendant at the preliminary hearing and at trial. Her in-court identifications were based, she said, on the several hours she spent with him.

This group of arguments, we think, go to the weight and credibility of her testimony, not its admissibility. Miss K., although only 13 at the time of trial, was clearly a competent witness. K. S. A. 60-417; *State v. Jones*, 204 Kan. 719, 466 P. 2d 283; *State v. De-Lespine*, 201 Kan. 348, 440 P. 2d 572. The fact that there was no line-up before the preliminary hearing does not make her identification at that time fatally deficient. *Dunlap v. State*, 212 Kan. 822, 512 P. 2d 484; *Reedy v. State*, 210 Kan. 793, 504 P. 2d 146. Her in-court identifications could stand on their own. *State v. Winston*, 214 Kan. 525, 520 P. 2d 1204; *State v. Lora*, 213 Kan. 184, 515 P. 2d 1086; *State v. Kelly*, 210 Kan. 192, 499 P. 2d 1040. And, of course, quite apart from Miss K.'s identification there was ample other identification evidence. It seems clear that her abductor and rapist was the driver of the 1969 Caprice bearing 1972 Missouri tags K4M-950, with the clothes in the back; the footlocker, ball bat and rifle in the trunk; and her pantyhose, bra and shoe in the front. It is also clear from the circumstances of his arrest that defendant was the driver of that car.

In his next three points defendant complains of the deposition

testimony of John R. Wilson in which he identified defendant as the person who held him up at the motel in Riverside and took his car, and the testimony of Missouri police officers relating to that robbery. The initial identification procedure through the use of photographs and newspaper articles was unduly suggestive, he says. The state concedes this much, but argues that the rest of his testimony was proper. The record is unclear as to just how much of the identification testimony was admitted and how much excluded, but it is clear that Wilson's account of the robbery and description of his car and contents were properly admitted, and without objection. That much of Wilson's testimony was all that was required for the purposes of this case although, as pointed out above, the defendant's identification was clearly established by other evidence. Any error in admitting identification testimony of Wilson's, if it was admitted, would have been harmless beyond any reasonable doubt. As to the police officers, their testimony depended on Wilson's to the extent that they identified photographs of the car defendant was driving as the same car taken from Wilson. We fail to find either error or prejudice in admitting this testimony.

Defendant's next two points raise numerous rulings on evidentiary matters, involving the scope of cross-examination, the admission and exclusion of opinions or conclusions, and the use of leading questions. We have examined each of these contentions and conclude that none of them approaches prejudicial error, particularly where the trial was to the court and not a jury. Cf., *State v. O'Neal*, 204 Kan. 226, 461 P. 2d 801; *Nauman v. Kenosha Auto Transport Co.*, 186 Kan. 305, 349 P. 2d 931.

Defendant's twelfth point is that the state failed to show that defendant intended "bodily injury" to his victim at the time he abducted her, as required by K. S. A. 21-3420 (c) (Weeks 1974), or that he in fact inflicted "bodily harm" upon her as is required to make the kidnapping aggravated under K. S. A. 21-3421 (Weeks 1974). The argument, although ingenious, is not sound. We have consistently held that rape supplies the element of "bodily harm" required to make a kidnapping first degree under our prior statutes. See, *State v. Brown*, 181 Kan. 375, 312 P. 2d 832; *State v. Ayers*, 198 Kan. 467, 426 P. 2d 21; *Sharp v. State*, 203 Kan. 937, 457 P. 2d 14. And cf., *State v. Schriner*, 215 Kan. 86, 523 P. 2d 703. We think it likewise constitutes "bodily harm" so as to make a kidnapping "aggravated" under our present law. And we think the subsequent events provide ample basis for a ready inference that defendant

intended the rape of this little girl when he lured her into his car with a promise of a modeling job.

He also complains that the trial court did not make a specific finding as to whether defendant's intent was to inflict bodily injury on Miss K. or merely to terrorize her. The evidence indicates he actually did both. The request for such a finding was made some ten days after the court announced its general verdict of guilt. On this record we fail to see how defendant was. prejudiced. See, *State v. Scott,* 201 Kan. 134, 439 P. 2d 78.

In point 14, defendant attacks the original arrest warrant, claiming there was an insufficient showing of probable cause to the Cloud county court when the complaint was filed. Assuming that were so, it would not vitiate his conviction. *State v. Addington,* 205 Kan. 640, 472 P. 2d 255.

In point 15 he claims error because when he first appeared before the Cloud county court at 11:00 in the morning of the day he was returned to Kansas and as his first stop in this state, he was not accompanied by counsel. At this hearing defendant was advised of the charges against him, his indigency was determined, and counsel was appointed. His contention that counsel should have been appointed earlier is groundless.

His next two points go to the specificity of the information and the court's denial of his motion for a bill of particulars. He wanted to know whether the state claimed his intent was to "terrorize" or to "harm" Miss K., and whether it claimed he "took" her or "confined" her with that intent. The information was in the language of the statute and was sufficient. K. S. A. 22-3201 (2) (Weeks 1974). Defendant had a full preliminary hearing, and a bill of particulars was not necessary to advise him of the state's claim. The court did not abuse its discretion in failing to require one. Cf. K. S. A. 22-3201 (5) (Weeks 1974); *State v. Lora,* supra.

In point 18 defendant claims the kidnapping statutes, K. S. A. 21-3420 and 21-3421 (Weeks 1974), are void for vagueness. He professes to be unable to understand what is meant by "bodily harm" or an intent to "terrorize" or to "inflict bodily injury." We think the ordinary man would have no difficulty in understanding what conduct is proscribed, and that the statutes are sufficiently definite. Cf., *State v. Gunzelman,* 210 Kan. 481, 502 P. 2d 705.

His next three points go to the test of criminal responsibility applied by the trial court. He urges us to abandon the *M'Naghten* rule both on the question of voluntary intoxication and insanity.

We have just recently declined to do that, as to intoxication in *State v. Seely,* 212 Kan. 195, 510 P. 2d 115 and *State v. Osbey,* 213 Kan. 564, 517 P. 2d 141, and as to insanity in *State v. Lamb,* 209 Kan. 453, 497 P. 2d 275 and *State v. Randol,* 212 Kan. 461, 513 P. 2d 248. We are given no reason to depart from that standard now, and as will be pointed out, this case provides no vehicle for doing so if we were so inclined.

His final point is that the evidence fails to support the trial court's finding of lack of intoxication and sanity. On the intoxication issue he points to defendant's long history of drug problems, and compares the known symptoms of drug use to the observed condition of the defendant at the time of his arrest. He asserts that the court was required from this evidence to find that he was suffering from the sudden withdrawal of amphetamines. Suffice it to say, the testimony of Dr. Breiner that defendant was not under the influence of drugs or alcohol was sufficient to support the trial court's findings on this issue. We cannot reweigh the evidence.

On the insanity issue, the expert testimony was not really in conflict. The state's psychiatrist stated that defendant was not psychotic, that he was sane under *M'Naghten,* and that his capacity to conform his conduct to the requirements of law was only slightly —not substantially—impaired.

Defendant's psychiatrist was of the opinion that if defendant had taken the amphetamines he said he had taken up to and including May 30, he would thereafter show incipient signs of withdrawal psychosis, and that assuming that was so, "at the time of the offenses charged, he was mentally disturbed and mentally upset to the extent of being in the early stages of a psychosis." He went on to say, however, "My opinion is that Barry was aware of what he was [d]oing at the time and that he did know that what he was doing was against the law." As to whether defendant was substantially incapable of conforming his conduct to the requirements of law, his response was: "I think there is a great deal of doubt about that." He never came closer to expressing a positive opinion on that issue.

From this evidence it may be seen that even if the trial court had applied a test of criminal responsibility incorporating the element of substantial impairment of capacity to conform as a result of mental illness, as suggested by the American Law Institute and as adopted in a number of jurisdictions, the defendant here

would not qualify. Under either *M'Naghten* or the A. L. I. test this defendant was responsible for his conduct.

We find no prejudicial error and the judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.