Nos. 47,359 and 47,815
(CONSOLIDATED)

STATE OF KANSAS, *Appellee*, v. WILLIE R. ADAMS, JR., *Appellant.*

(545 P. 2d 1134)

Opinion filed January 24, 1976.

*Stephen Jones*, of Oklahoma City, Oklahoma, argued the cause, and *Van Delhotal*, of Weigand, Curfman, Brainerd, Harris and Kaufman, of Wichita, was with him on the brief for the appellant.

*Robert L. Kennedy, Jr.*, Assistant District Attorney, argued the cause, and *Curt T. Schneider*, Attorney General, and *Keith Sanborn*, District Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: The defendant-appellant (Willie R. Adams, Jr.) appeals from convictions by a jury of three counts of aggravated burglary and one count each of kidnapping, battery, aggravated kidnapping, and rape. At the time of the alleged offenses defendant was a Wichita police officer. The charges stem from three separate incidents and involved the residences and persons of two Wichita housewives and a young single person, who resided with her parents, but is now married. The three were complaining witnesses to the charges filed concerning each respective incident. The complaining witnesses will be identified by initial in this opinion.

Each of the three incidents involved an alleged forcible entry with the display of a handgun. The first incident occurred on February 14, 1973, the other two, one week later, on February 21, 1973.

On the date of the first incident, Mrs. G, a Wichita housewife, was at her home in Wichita. In the front yard there was a sign indicating a house for sale. Mrs. G's home was not for sale, but the sign had been placed there because it was more visible to traffic. The sign pointed to a house down the street which was on the market. Mrs. G testified that the defendant came to her door at approximately 1:30 p.m. on the day in question inquiring about the house for sale. She directed defendant to the other house and closed the door as he left. Shortly thereafter, defendant returned to her door, stating that he was having trouble locating the house. Mrs. G partially closed the front door and left defendant standing on the porch while she went to the kitchen to telephone her neighbors who were showing the house. As she dialed, Mrs. G testified she heard someone say "Put it down," and turned to see defendant standing in her house pointing a gun at her; she put the receiver down. The defendant forced her at gunpoint to go to a bedroom. Once in the bedroom defendant made her take off her sweater and brassiere and forced her to lie on the bed whereupon he sucked her breasts. Mrs. G.

positively identified defendant as her assailant and identified the gun taken from defendant, as well as his jacket and trousers.

After defendant finished caressing Mrs. G he made her get into a closet saying, "You're not going to know when I leave and I will shoot you if you come out of there." Mrs. G waited in the closet for some time until her telephone rang. She came out and answered the phone and then promptly called her husband. He called the police.

With respect to this incident, defendant admitted going by the residence in question to inquire about the house for sale on another day, but denied that he returned to Mrs. G's house, or that he ever entered her home. He said that on the day in question, February 14, 1973, he had been at the National Bank of Wichita from 1:25 p. m. and waited there for his wife until about 3:00 p. m.

The first three counts of the information were based on the first incident. The charges were aggravated burglary (K. S. A. 21-3716); kidnapping (K. S. A. 21-3420); and battery, a class B misdemeanor under K. S. A. 21-3412. Defendant was convicted on each of the three counts.

The second incident occurred a week later, on February 21, 1973. Miss D was a co-worker with defendant's wife at the National Bank of Wichita and knew defendant through this association. She resided with her parents in Wichita.

At approximately 11:30 a. m. on February 21, Miss D left the bank for lunch and went to her home to eat. While she was eating, she heard the front door open; thinking it was her mother arriving for lunch, she went to the front door to meet her. She testified that a man came through the door, pointing a pistol at her, and walked toward her. She recognized this man as the defendant. Defendant grabbed a sandwich from her hand and stood staring at her body, particularly her pelvis and breasts. When defendant finally looked at Miss D's face she testified he had a startled expression, that his eyes "got kind of big, as if he knew me or something." She asked the defendant what he was doing there. He said he had seen her drive home from work and decided to follow her home to say "hi." Miss D then walked over and opened the front door to let defendant out. He followed and told her he was trying to teach her a lesson about keeping her doors locked. At this point, Miss D's mother drove up. Defendant instructed Miss D not to tell his wife that he had been there and not to tell her

mother about this. He then walked quickly to his black over maroon Thunderbird automobile and drove away.

Miss D told her mother that the man was a policeman and the husband of a co-worker at the bank, but neglected to mention anything about the gun or the individual's stare. She returned to work and waited until after work to tell her father about the gun-related incident. Her father immediately called the police.

On the second incident defendant was charged in count seven with aggravated burglary under K. S. A. 21-3716.

At approximately 2:00 p. m. on the same day Mrs. C was returning to her home in west Wichita with two of her three children. She had just returned from errands at the National Bank of Wichita and a grocery store. On the way home, Mrs. C observed a maroon Thunderbird automobile with a black top parked near her home. She saw a man sitting in the automobile. When she got home, she called her husband to discuss a trip they were planning. While on the telephone she observed the man from the Thunderbird walking up toward her house. She hung up the receiver so that she could answer the doorbell. As she started to open the front door, the man identified by Mrs. C as the defendant put his foot in the opening and forced his way into the house. While trying to push defendant out of her house, Mrs. C's hand fell on his gun and she jumped back. Defendant then came into the house and closed the door behind him. He asked her to get rid of the children so she ordered them to go to the basement, closing the basement door after them.

She testified that the defendant held the pistol to her back and ushered her into the master bedroom; forced her to undress; and ordered her to lie down on the bed. Defendant put the pistol in his coat pocket, unzipped his trousers and got on top of Mrs. C. Although defendant's penis was flaccid the only time Mrs. C saw it, she testified that he used his hands to insert it into her vagina and that she felt penetration. She further testified that defendant was upon her for about ten minutes and then told her to put her robe on and forced her at gunpoint to go to the basement. Defendant then ran out of the house. Mrs. C saw the defendant leave in the Thunderbird with the black vinyl top. She promptly called her husband, who called the police and then came home to see her. Meanwhile, a police dispatcher called Mrs. C and got the description of the assailant and his automobile.

Defendant was subsequently apprehended in his Thunderbird

automobile after a high speed chase with police in pursuit through the streets of Wichita.

Defendant testified that he came to Mrs. C's door to get directions; that once inside she made a pass at him; that he never did have an erection, never entered her, had a premature ejaculation; and then got up, leaving Mrs. C angry with him. As evidenced by its verdict the jury did not believe his version of the ordeal.

As a result of this last incident, defendant was charged in counts four, five and six with aggravated burglary (K. S. A. 21-3716); aggravated kidnapping (K. S. A. 21-3421); and rape (K. S. A. 21-3502).

Following the preliminary hearing and prior to trial, defendant filed numerous motions—ten in all—which were heard and disposed of by the administrative judge of the district court. The motions and rulings thereon, which are pertinent to points on appeal, will be discussed in the course of this opinion.

Defendant briefs six points on appeal which will be considered in the order presented.

Defendant first claims error by the administrative judge in overruling his motion to remand for further preliminary hearing. Defendant devotes a major portion of his brief on appeal to his arguments on this point. Before discussing the arguments presented by defendant it should be noted that at the hearing on the motion below, the administrative judge recessed the hearing and read the entire transcript of the preliminary hearing before announcing his ruling the following day. The administrative judge announced his ruling as follows:

"The Court is going to overrule the motion to remand. The Court is of the opinion that the purpose in a preliminary hearing—and we have it rather than grand jury indictment—is to advise the defendant of the charges against him, to determine whether a crime has been committed, and probable cause the defendant committed the crime. It's not for the purpose of a fishing expedition in the Court's opinion. Your next motion we'll take up is a motion to dismiss."

Under the provisions of our new criminal code (K. S. A. 22-3208), upon the timely filing of a proper motion, the sufficiency of a preliminary hearing is reviewable by the district court and this court on appeal. However, issues not raised by the motion below or presented to the district court are deemed to have been waived. (*State v. Smith*, 215 Kan. 34, 523 P. 2d 691.)

Defendant first argues that the magistrate exhibited a prejudicial

attitude toward the defense and unduly restricted cross-examination of the state's witnesses by defendant's counsel. In support of his contention defendant lists, in his brief, examples of questions put to Mrs. G by defense counsel during the cross-examination to which objections were sustained. Among the questions listed by defendant were—"where were you born? . . . What is your husband's name . . . what is your husband's birth date . . . .? Have you ever filed a law suit against your husband for divorce, Mrs. G? Were you employed outside your home when this happened?" Most of the state's objections were sustained on the grounds of irrelevancy.

In essence, defendant argues that the scope of relevancy allowed by the magistrate was unduly restricted and did not provide defendant with the discovery to which he felt entitled in the preliminary hearing.

In the direct examination of Mrs. G, pertaining to the charge of battery in count No. 3, defendant specifically complains of the magistrate's action in suggesting and allowing the prosecutor to suggest to Mrs. G that if someone was sticking a gun at her head, she could answer that she considered that conduct to be rude. The record reveals that any such alleged coaching of this witness had no effect on her testimony. She ultimately supplied this element of the crime in her own words by stating: "Well, he forced himself on me. Yes, I feel that's rude." In any event, no other reasonable conclusion could have been reached under the evidence relating to defendant's acts.

Defendant also specifically claims error by the magistrate in sustaining the state's objection to a question put to Mrs. C by defendant on cross-examination concerning a sodium pentothal test which had been given defendant. The question was:

"Subsequent to this event had the police questioned you with reference to any sodium pentothal tests given the Defendant?"

After the state's objection was lodged the magistrate held an in-chambers conference and ruled that the witness could be asked if she had modified her original statement to the police as a result of subsequent interviews with the police as long as the sodium pentothal test was not mentioned. The magistrate stated that mention of the test should be avoided because, if the transcript were read at trial, a jury would be prejudiced by reference to the test. The defendant was not actually deprived of desired

information, and we believe the matter demonstrated the magistrate's awareness of the problem involved and, further, that his actions were reasonably undertaken to protect the integrity of the trial process.

Defendant also contends that the magistrate erred in refusing to enforce various subpoenas duces tecum served on numerous witnesses called by the defense. Although the prosecution endorsed numerous other witnesses on the complaint, it called only the three victims at the preliminary hearing. The defendant called many of the state's witnesses in addition to his own and issued subpoenas duces tecum on virtually every police officer who participated in the investigation, asking for all reports they had prepared with reference to the complaint and copies of all statements, together with all photographs, tape recordings and any other real or physical evidence together with any medical reports on the victims. The magistrate allowed defendant to discover a copy of a statement made to the police by the prosecution witness, Miss D.

As each of these witnesses was called by the defendant to testify, the witness was asked by defendant's counsel if he had the documents requested under the subpoena. In each case the state's attorney objected on the grounds that subpoena duces tecum was an improper means of discovery under Kansas law, inasmuch as K. S. A. 22-3212 (Discovery and Inspection) provided the means whereby defendant could obtain copies of or the right to inspect the documents or evidence he sought. The magistrate specifically advised defendant that the documents and photographs he sought were available under 22-3212. Likewise, concerning the various subpoenas duces tecum directed toward discovery of results of scientific tests or medical examinations conducted during the investigation of the case, the magistrate stated numerous times such results were available by a proper motion under 22-3212. Subsequent to the preliminary hearing, defendant filed a motion under 22-3212. On appeal he makes no complaint about the disposition of this motion, therefore, we assume that defendant obtained discovery of the material sought well in advance of trial. Thus, the only prejudice which could have been suffered by defendant was that he did not have the results of such tests and examinations at the preliminary hearing.

Copies of the subpoenas duces tecum are not reproduced in the record. However, we are informed as to the general context

thereof from questions put to the witnesses and the objections and arguments of counsel reproduced in the record. The defendant fails to demonstrate specifically how he was prejudiced by the magistrate's failure to enforce the subpoenas at the preliminary hearing, and since he subsequently did file a discovery motion and makes no complaint about the ruling thereon, it appears defendant acquired all of the desired information prior to trial. There is no showing that any specific exculpatory evidence, documentary or otherwise, in the hands of the prosecution was withheld either at the preliminary hearing or at trial. The record actually indicates, as the administrative judge observed, that the defendant was using the preliminary hearing as a "fishing expedition" in order to discover some evidence that might be of benefit to the defense. The record reveals that the magistrate's ruling was not premised on the theory that defendant was not entitled to the subpoenaed material, but rather that defendant had resorted to an improper remedy in seeking its production. As we have noted, the magistrate pointed out on numerous occasions that the defendant could have access to the documents under 22-3212 and 22-3213, but for some undisclosed reason the defendant insisted on subpoena procedure under K. S. A. 22-3414. While defendant could have resorted to discovery procedure, as indicated by the magistrate, this alternative did not deprive him of his right to subpoena *duces tecum*. In *State v. Humphrey*, 217 Kan. 352, 537 P. 2d 155, in upholding a defendant's right to issue a subpoena duces tecum, we said:

". . . K. S. A. 1972 Supp. 22-3214 [now K. S. A.] declares categorically that any person charged with a crime shall be entitled to the use of subpoenas and other compulsory process to obtain the attendance of witnesses. . . ." (p. 361.)

However, we do not construe 22-3214 to remove all control of compulsory process from a magistrate or judge. A magistrate is not without authority to confine a preliminary hearing to matters relevant to the hearing's purpose. In *State v. Campbell*, 217 Kan. 756, 539 P. 2d 329, among other matters, we considered the extent of allowable discovery following a grand jury indictment and prior to trial. We quoted with approval this pertinent excerpt from 7 A. L. R. 3d 8 (Anno., Discovery-Prosecution's Evidence), § 7:

" 'The defendant must show some better cause for inspection than a mere desire for all information which has been obtained by the prosecution in its investigation of the crime. The production of the prosecution's evidence is

not allowed to the defendant for exploratory purposes or for the purpose of prying into the prosecution's preparation for trial. The defendant has no right to invoke the means of examining the prosecution's evidence merely in the hope that something may turn up to aid him. A blanket request for production of the prosecution's evidence will not be granted. The defendant's motion for production of the prosecution's evidence must be based on facts, and not on conclusions or mere surmise and conjecture.' (pp. 50-51.)" (p. 782.)

The preliminary hearing in this case, with several recesses, extended over a period of more than six weeks. Testimony was taken during at least five days. The testimony and proceedings consume 293 pages of the record. The defendant called eighteen witnesses on his behalf and conducted an extended cross-examination of the state's witnesses. We believe defendant was fully informed of the nature of the crimes charged against him and was apprised of the sort of evidence to be used by the state. Certainly, sufficient evidence was adduced by the state to establish that the crimes charged had been committed and that there was probable cause to believe that defendant committed those crimes.

The nature and purpose of a preliminary hearing was set forth in the case of *In re Mortimer*, 192 Kan. 164, 386 P. 2d 261, wherein we held:

"A preliminary examination is not a trial of defendant's guilt; it is rather an inquiry whether the defendant should be held for trial.

"The principal purpose of a preliminary examination of one accused of crime is to determine that a crime has been committed and to give him general information of the nature of the crime charged, and apprise him of the sort of evidence he will be required to meet when he is subjected to a final prosecution in the district court.

"In such an examination it is not necessary that the evidence upon which the accused is bound over for trial be sufficient to support a conviction. It is enough if it is shown that the offense charged had been committed and there is probable cause to believe the defendant committed the offense." (Syl. ¶¶ 1, 2 and 3.)

The *Mortimer* declaration of the purpose and nature of a preliminary hearing has subsequently been approved in *State v. Smith*, supra; and *State v. Fink*, 217 Kan. 671, 538 P. 2d 1390.

From the tenor of defendant's arguments it appears that he would shift the primary focus of a preliminary hearing from determining whether a crime has been committed and sufficient probable cause established to hold an accused to the purpose of complete and unlimited discovery. A similar endeavor by the defendant in a preliminary hearing before a Commissioner in *United States v. Lipshitz*, 150 F. Supp. 321, was said to be "tanta-

mount to what has been characterized as a 'dress rehearsal' of the prosecution."

The defendant was not denied the right to produce evidence material to the issues in a preliminary hearing, as in the case of *Beaird v. Ramey*, (Okl. Cr.) 456 P. 2d 587, cited by defendant. As noted above, defendant called eighteen witnesses on his behalf.

We have carefully examined the contentions made by industrious counsel and conclude that there was no showing made of substantial prejudice to defendant's rights which would have warranted a remand by the administrative judge for a further preliminary hearing.

The defendant next lodges a two-fold complaint concerning the trial court's denial of his motion to reduce the aggravated kidnapping charge alleged in count No. 5 (Mrs. C) to kidnapping. Defendant first contends that "bodily harm" was not proven and, second, in the alternative that our kidnapping statutes (K. S. A. 21-3420 and 21-3421) are constitutionally void for vagueness. The dispositions of both contentions are controlled by *State v. Barry*, 216 Kan. 609, 533 P. 2d 1308, wherein we stated:

". . . We have consistently held that rape supplies the element of 'bodily harm' required to make a kidnapping first degree under our prior statutes. See, *State v. Brown*, 181 Kan. 375, 312 P. 2d 832; *State v. Ayers*, 198 Kan. 467, 426 P. 2d 21; *Sharp v. State*, 203 Kan. 937, 457 P. 2d 14. And cf., *State v. Schriner*, 215 Kan. 86, 523 P. 2d 703. We think it likewise constitutes 'bodily harm' so as to make a kidnapping 'aggravated' under our present law. . . ." (p. 618.)

Concerning vagueness it is stated further in the *Barry* opinion:

"In point 18 defendant claims the kidnapping statutes, K. S. A. 21-3420 and 21-3421 (Weeks 1974), are void for vagueness. He professes to be unable to understand what is meant by 'bodily harm' or an intent to 'terrorize' or to 'inflict bodily injury.' We think the ordinary man would have no difficulty in understanding what conduct is proscribed, and that the statutes are sufficiently definite. Cf., *State v. Gunzelman*, 210 Kan. 481, 502 P. 2d 705." (p. 619.)

In point 3, defendant contends the trial court erred as a matter of law and violated K. S. A. 21-4602 and 21-4603 in sentencing defendant without considering probation or suspension of a portion of defendant's sentence. The record does not support defendant's contentions—it clearly reveals the trial court exercised its discretion under 21-4603. In pronouncing sentence, the trial court stated:

"Under the pre-sentence report and all I know about the case, this is Mr. Adams' first criminal offense. I can't figure out why he did it and I don't know anybody else that can. It is very commendable that his family has been with him and is still with him and supporting him in this tragedy. We have taken statements from his wife and other people and they are still on his side. That speaks well for rehabilitation. Also I might add that under 21-4603 of the Kansas Statute that this Court has—and I will read the Statute, 'Any time with[in] 120 days after sentence is imposed or within 120 days after probation has [992] been revoked, the Court may modify such sentence or revocation of probation by directing that a less severe penalty be imposed in lieu of that originally adjudged within the statutory limits,' or make other orders. And the purpose for that, of course, is to allow the Court to utilize the very superior service of the Diagnostic Center, thoroughly evaluate the defendant and see what is best for both the defendant and society. So, we are given pretty good tools here in Kansas to work out criminal cases."

Defendant cites *State v. Owens & Carlisle,* 210 Kan. 628, 504 P. 2d 249. In the *Owens* case, the trial judge did not consider his options under 21-4603, but attempted to shift all responsibility in this regard to the State Board of Probation and Parole. This case is not in point.

In the instant case the record clearly shows the court considered and denied probation and its ruling will not be disturbed on appeal. In *State v. Benson,* 207 Kan. 453, 485 P. 2d 1266, we stated that the granting of probation is exclusively a function of the trial court and we held that a decision of the court denying probation is not subject to review by an appellate court.

Defendant next claims error in the denial of his motion for severance. In his motion defendant requested that counts one through three be severed and also count seven. In effect the defendant asked that he be given three separate trials. Defendant argues that he was prejudiced and embarrassed by reason of the joinder of seven counts.

Joinder of counts in the same complaint or information is governed by K. S. A. 22-3202(1), which reads:

"(1) Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

This statute codified prior case law of this state governing joinder of offenses in one information. (*State v. Cameron & Bentley,* 216 Kan. 644, 533 P. 2d 1255; and *State v. Thomas,* 206 Kan. 603, 481

P. 2d 964.) Whether a defendant may be tried on all separate charges at one trial rests in the sound discretion of the trial court and its holding will not be disturbed on appeal, absent a clear showing of abuse. (*State v. Anderson,* 202 Kan. 52, 446 P. 2d 844; and *State v. Brown,* 181 Kan. 375, 312 P. 2d 832.) The test to be applied is set forth in *State v. Ralls,* 213 Kan. 249, 515 P. 2d 1205, in these words:

".   .   . When all of the offenses are of the same general character, require the same mode of trial, the same kind of evidence and occur in the same jurisdiction the defendant may be tried upon several counts of one information or if separate informations have been filed they may be consolidated for trial at one and the same trial. (citing cases.)" (pp. 256, 257.)

The crimes charged herein are either the same or similar offenses. In each of the three separate incidents an aggravated burglary occurred. In two of the offenses (Mrs. G and Mrs. C) either a kidnapping or aggravated kidnapping occurred, distinguished only by the fact that a rape took place in one. The battery was not merely the unsolicited, rude touching of another, but an application of force of an obvious sexual nature. With the exception of battery all charges involved the same type of punishment. Two incidents occurred, one after the other, on the same day and within one week of the third. Sex was the underlying motivation in each instance.

A question of severance involving joinder of similar offenses, in much the same context, was before the court in *State v. Brown,* 181 Kan. 375, 312 P. 2d 832, wherein we said:

".   .   . The counts charging the defendant with kidnapping in the first degree and with the rape of Mrs. Harris grew out of the same transaction and were part of the same plan of the defendant in perpetrating the acts. These are properly joined with the count charging assault with intent to rape committed one week later. As between the first two and the latter, the offenses are of the same general character, requiring the same mode of trial, the same kind of evidence and the same kind of punishment. The trial of the defendant, therefore, on the several counts joined was within the sound discretion of the trial court and no error was committed by the trial court in overruling the defendant's motions." (pp. 382, 383.)

Defendant cites *State v. Thomas,* supra, wherein we held joinder to be improper. *Thomas* is distinguishable on the facts. *Thomas* involved two separate cases which were consolidated for trial. One consisted of several counts of forgery and uttering with burglary and larceny. In the other case defendant was charged with murder, robbery and unlawful possession of a firearm. There was no connection between the victims in the two cases, the dates of

the offenses, and crimes charged were obviously of a dissimilar character requiring a different type of evidence as proof.

The *Brown* case involved two victims and two separate incidents a week apart. We believe what was said therein controls disposition here. We find no abuse of discretion in the trial court's ruling.

Finally, defendant contends the trial court erred in refusing to admit into evidence the results of a polygraph examination and the testimony of Dr. C. J. Kurth, a psychiatrist, regarding a psychiatric examination of defendant conducted under the influence of sodium pentothal.

The trial court's rulings on both points are supported by decisions of this court. In the recent case of *State v. Hemminger*, 210 Kan. 587, 502 P. 2d 791, we said:

"Truth serum tests occupy much the same position as lie detector tests and in general courts have never admitted the results of such tests into evidence for the purpose of proving the truth of the matters asserted by the defendant. (*State v. Lee*, 197 Kan. 463, 419 P. 2d 927, cert. den. 386 U. S. 925, 17 L. Ed. 2d 797, 87 S. Ct. 900, reh. den. 386 U. S. 978, 18 L. Ed. 2d 142, 87 S. Ct. 1170; 29 Am. Jur. 2d, Evidence, § 831; 22A C. J. S., Evidence, § 645[2].)" (p. 595.)

More recently, we said in *State v. Stafford*, 213 Kan. 152, 515 P. 2d 769:

"In Kansas the results of a lie detector test, because of their unreliability, have always been held to be inadmissible in evidence (citing cases). . . ." (p. 162.)

In support of his argument concerning the trial court's rejection of the results of the sodium pentothal examination, defendant cites *State v. Chase*, 206 Kan. 352, 480 P. 2d 62. In *Chase* the defense was insanity. Dr. Joseph Satten, an eminent psychiatrist, had been appointed as a member of a commission to inquire into defendant's capacity to stand trial. At trial Dr. Satten was called by defendant as a witness on the issue of insanity. In connection with a psychiatric examination of defendant, Dr. Satten had employed sodium pentothal as one of several techniques used in determining mental capacity. In his testimony, Dr. Satten was permitted to describe the use of sodium pentothal as one of the techniques used by him, but a video tape disclosing defendant's answers to questions, while under the influence of sodium pentothal, was rejected.

In the instant case, the proffer made by defendant was Dr. Kurth's testimony to the effect that defendant's statements made, while under the influence of sodium pentothal, did not vary from state-

ments given by defendant while not under the influence of the drug. In other words, the testimony of Dr. Kurth, concerning the sodium pentothal test, was offered to establish the truth of matters asserted by defendant, which has not yet been permitted by any court. (29 Am. Jur. 2d, Evidence, § 831, pp. 923, 924; and *State v. Thomas,* supra.) It is the jury's function to pass on the credibility of witnesses.

The evidence proffered by defendant concerning the polygraph and sodium pentothal tests was properly rejected by the trial court.

We have examined all points raised and the judgment is affirmed.